896 F.2d 815
 UNITED STATES of America, Plaintiff-Appellee,
v.
Lyndon H. LAROUCHE, Jr.; William Wertz; Edward Spannaus;
Michael Billington; Dennis Small; Paul
Greenberg; Joyce Rubinstein,
Defendants-Appellants,
William P. Robinson, Jr. et al., Amici Curiae.
 No. 89-5518.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 6, 1989.
Decided Jan. 22, 1990.
Rehearing and Rehearing In Banc Denied Feb. 16, 1990.
 
 Ramsey Clark (Ramsey Clark & Lawrence Shilling, on brief), Odin Phillips Anderson (Robert L. Rossi, Anderson & Associates, P.C.; R. Kenly Webster, Thomas C. Hill, Gadi Weinrich, Shaw, Pittman, Potts & Trowbridge, Brian P. Gettings, Cohen, Gettings, Alper & Dunham, James C. Clark, Land, Clark, Carroll & Mendelson, Edwin Williams, Kellogg, Williams & Lyons, on brief) for defendants-appellants.
 Kent S. Robinson, Asst. U.S. Atty. (Henry Hudson, U.S. Atty., John J.E. Markham, III; Mark D. Rasch, Sp. Asst. U.S. Atty., on brief) for plaintiff-appellee.
 William P. Robinson, Jr., Robinson, Zaleski & Lindsey, Maitre Jacques Stul, Edward de Grazia, Lennart Hane, James R. Mann, Edwin Vieira, Jr., Charles E. Rice, Jay Alan Sekulow, Thomas P. Monaghan, Christine Kasun, Amshoff, Amshoff & Monaghan, Maitre Jean-Marc Varaut, James R. Mann, Professor Dr. Albert Bleckmann, Professor Dr. Hans Richard Klecatsky, Professor Dr. Wolfgang Waldstein, R. David Pembroke, on brief, for amici curiae.
 Before HALL and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 MURNAGHAN, Circuit Judge:
 
 
 1
 On Friday, October 14, 1988, a federal grand jury in the Eastern District of Virginia, Alexandria Division, handed down a thirteen-count indictment against Lyndon LaRouche, Jr., Edward Spannaus, William Wertz, Michael Billington, Dennis Small, Paul Greenberg, and Joyce Rubinstein. Count One was Conspiracy to Commit Mail Fraud, on which all of the defendants were charged; Counts Two through Twelve were various counts of mail fraud charged to various defendants; and Count Thirteen was Conspiracy to Defraud the Internal Revenue Service, on which only LaRouche was charged. On December 16, 1988, a jury in the United States District Court for the Eastern District of Virginia found the seven defendants guilty on all of the counts with which they had been charged.
 
 
 2
 The convictions and sentences are before us on appeal. The defendants claim that the district court did not afford them a fair trial. Specifically, they contend that: (1) the district court erred in denying their motion for a continuance of the trial date; (2) the district court erroneously denied their discovery request for exculpatory material; (3) the district court made numerous evidentiary rulings, in limine and at trial, that unconstitutionally restricted their ability to defend against the charges; (4) the trial judge failed to conduct a voir dire sufficient to impanel an unbiased jury and improperly failed to excuse several jurors for cause; (5) the mail fraud counts were improperly joined with the tax conspiracy count; (6) the sentence imposed on LaRouche was excessive; (7) the district court erroneously instructed the jury on the tax count; and (8) the district court erred in allowing the introduction of illegally seized evidence. The defendants also maintain that the evidence introduced at trial was insufficient to sustain the convictions of LaRouche and Spannaus on all counts and of some of the defendants on several counts. After carefully reviewing the case, we find no basis for disturbing the defendants' convictions and the sentences imposed upon them.
 
 I. THE FACTS
 
 3
 The government sought to prove that the seven defendants, acting through the National Caucus of Labor Committees ("NCLC") (also known as "the LaRouche Organization"), fraudulently solicited loans from contributors. Specifically, the government alleged that the defendants promised to pay back borrowed funds at specific times and at stated interest rates when they knew such loans would not be so repaid, and that they promised the lenders that the funds would be used for specific purposes even though the funds were not to be so used. Furthermore, the indictment charged that LaRouche conspired to defraud the Internal Revenue Service.
 
 A. The NCLC
 
 4
 LaRouche, a candidate for the Democratic Presidential nomination in 1980 and 1984 and an independent candidate for President in 1984, headed the NCLC. The NCLC supported various political candidates and initiatives and published numerous books and periodicals. The NCLC had offices across the country and carried out many of its activities through commercial corporations and political committees.
 
 
 5
 LaRouche controlled the NCLC, including its fundraising operations and its finances. Daily operations of the NCLC were governed by the National Executive Council ("NEC"), which consisted of 13 LaRouche associates.
 
 
 6
 William Wertz, a member of the NEC, was in charge of fundraising for the NCLC. Edward Spannaus, also a member of the NEC, helped the NCLC on legal matters. Michael Billington and Dennis Small were telephone fundraisers for the national office of the NCLC. Paul Greenberg was in charge of fundraising for the Chicago office. Joyce Rubinstein was a fundraiser in the New York office.
 
 B. The Fundraising
 
 7
 In 1983, LaRouche, who was becoming increasingly dissatisfied with the fundraising performance of some of NCLC's offices, promoted William Wertz, who had headed the successful West Coast fundraising offices, to the NEC and placed him in charge of national fundraising. LaRouche's dissatisfaction also precipitated aggressive fundraising tactics.
 
 
 8
 One former LaRouche associate testified that LaRouche, at an NEC meeting, expressed his dissatisfaction with fundraising and his belief that members of the organization were not "getting tough enough with the general population." Allegedly, LaRouche characterized adequate fundraising as essential to get him to the White House and without his presence in the White House, there was "no hope for mankind." Another LaRouche associate testified that LaRouche exhorted to NCLC members that "the human race was on the verge of destruction or self-destruction as a result of its imbecility, its sheeplike quality, and that it lacked itself the moral fitness to survive." Because he needed funds to save humanity, LaRouche was said to have told NCLC members that "any means short of thievery or thuggery [was justified] to raise that money."
 
 
 9
 Pugnacity apparently became the theme of the LaRouche Organization's fundraising tactics. A former LaRouche fundraiser testified that when he started on a phone team, he was told as follows:
 
 
 10
 You have to have only one thing on your mind. That is getting the money. No matter what the person you are talking to says, get the money. If you are talking to a little old lady and she says she is going to lose her house, ignore it. Get the money. If you are talking to an unemployed worker who says he has got to feed ... a dozen children, forget it. Get the money. Most of these people are immoral anyway. This is the most moral thing they have ever done is to give you money.
 
 
 11
 Fundraisers began working very long hours and complained of "being driven into the ground."
 
 
 12
 LaRouche and Wertz set high fundraising goals for the organization, for each office, and for each individual fundraiser. LaRouche was said to have blamed the fundraisers' inadequacy on "sexual impotence." Wertz and regional fundraising supervisors reacted angrily to fundraising shortfalls and the individual fundraisers, when failing to meet established quotas, became hysterical, distraught, and depressed.
 
 
 13
 Fundraisers began to take loans, as opposed to donations, from contributors in ever increasing amounts. In 1984 and 1985, the amount that the LaRouche organization borrowed from contributors increased dramatically; more than $25 million was borrowed from contributors in those two years alone.
 
 C. The Borrowing
 
 14
 It was the way that those borrowed funds were obtained that concerned the government prosecutors. The government alleged that LaRouche communicated to his organization a "forgive and forget" policy, whereby fundraisers would initially try to persuade individual lenders to convert their loans into contributions. Lenders who still demanded payment would not be repaid. One former LaRouche fundraiser testified that Wertz characterized lenders, who asked for the return of their money, as immoral. According to the government, the nonpayment policy did have two exceptions: (1) if alienating the lender might result in significant adverse political consequences; or (2) if the lender was going to file suit.
 
 
 15
 The government sought to prove that potential lenders heard quite a different story from the organization's fundraisers: they were told that their money would be safer with the LaRouche Organization than with a bank and that they would be repaid on specific terms, at specific rates of interest; the lenders were never told of the organization's financial difficulties; and even when some of the lenders became disgruntled, they were assured of repayment. Many lenders lost significant amounts of money. Furthermore, the government introduced evidence at trial to prove that the defendants knew of the falsity of the repayment and interest representations.
 
 
 16
 D. The Conspiracy to Defraud the Internal Revenue Service
 
 
 17
 In addition, the government charged LaRouche with conspiring to defraud the Internal Revenue Service ("IRS"). It sought to prove that the LaRouche Organization compensated LaRouche by maintaining his lifestyle, including the costs of his housing, food, furniture, and clothing, rather than by paying him a salary. In addition, the government alleged, a variety of affirmative steps were taken by LaRouche and associates to conceal some of the payments and to characterize others as gifts. Among other things, LaRouche did not file income tax returns for the calendar years 1980, 1981, and 1982, the period during which the alleged conspiracy occurred.
 
 E. The Boston Trial
 
 18
 An indictment was issued by a federal grand jury in Boston, Massachusetts, on October 6, 1986, against the LaRouche Organization and several of its associates. In July 1987, a second superseding indictment added LaRouche as a codefendant in the Boston case. The Boston indictment charged the NCLC, along with LaRouche, Spannaus, and others, with participating in a conspiracy to obstruct justice and to impede a federal investigation into fraudulent fundraising practices. The LaRouche Organization and thirteen LaRouche associates were also charged with scheming to commit credit card fraud and to obtain fraudulent loans. Jury selection for the Boston trial began in September 1987 and the Boston trial began on December 17, 1987. On May 4, 1988, after four months of trial, Judge Robert E. Keeton declared a mistrial due to "severe hardships" that would be suffered by four of the jurors if the trial continued. A retrial in Boston was set for January 3, 1989.
 
 F. The Virginia Proceedings
 
 19
 After the thirteen-count indictment came down in the instant case on October 14, 1988, Judge Bryan held arraignment on October 17 and scheduled the trial to commence on November 21. At arraignment, the defendants filed a motion to transfer the trial to Boston due to the similarity in parties, charges, and proof. According to the defendants, the Virginia indictment was very similar to the Boston indictment and was designed to achieve the same law enforcement objectives. On October 21, 1988, the district court denied the defendants' motion to transfer the case to Boston. The defendants filed many other pretrial motions, most of which were denied.
 
 
 20
 Trial commenced on November 21, 1988. Among other witnesses, ten disgruntled lenders testified at the trial. None of the defendants took the stand. On December 16, 1988, after a four-week trial, the jury returned verdicts of guilty on all of the counts with which the defendants had been charged.
 
 
 21
 LaRouche was sentenced to a term of imprisonment of five years as to each of the thirteen counts of conviction. The court ordered counts 1 to 4, 5 to 9, and 10 to 13 to run concurrently, so that LaRouche was sentenced to a total period of incarceration of fifteen years. Wertz and Spannaus were each fined $1,000 and ordered to serve five years imprisonment. Billington, Small, Greenberg, and Rubinstein were each sentenced to three years imprisonment and ordered to pay various fines.
 
 II. SUFFICIENCY OF THE EVIDENCE
 
 22
 We first evaluate the defendants' arguments that there was insufficient evidence to find LaRouche and Spannaus guilty on any count and to find any of the defendants guilty on several counts. The relevant question is "whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant[s] guilty beyond a reasonable doubt." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982) (emphasis in original).
 
 A. Mail Fraud
 
 23
 The criminal mail fraud statute proscribes the utilization of the mails in furtherance of a scheme to defraud or to obtain money by means of false pretenses, representations, or promises. 18 U.S.C. Sec. 1341 (1982).
 
 
 24
 LaRouche argues that no evidence exists to implicate him in NCLC's fundraising activities, which the jury found to be fraudulent. LaRouche's claim is contradicted by the record. Testimony was introduced to show that LaRouche controlled the fundraising activities of the organization and that he was well aware of its financial difficulties. Testimony also evidenced LaRouche's demands for more aggressive fundraising tactics. The government introduced evidence that, after an inquiry about disgruntled lenders' demands, LaRouche responded, "Forgive or forget," thereby creating a policy of the nonpayment of loans. The government also exhibited a letter that LaRouche sent to a lender in which he blamed the nonpayment of her loan on "wicked operations by adversaries" and claimed that the entity responsible for repaying her loan had no discretion in the matter; other evidence showed that his claims in the letter were false. Sufficient evidence supports the jury's conclusion that LaRouche participated in the organization's fraudulent fundraising practices.
 
 
 25
 The record also fully supports Spannaus' conviction. Through the notes in his notebook, evidence of his involvement in the formulation of the nonpayment policy exists. The government also presented evidence that: Spannaus responded to one lender complaint stating that the lender had no right to get his money back; and Spannaus wrote letters to lenders assuring them that the repayment program had been restored and issued letters of indebtedness stating that loans would be repaid at stated times and rates, even though he knew of the campaign's nonpayment policy.
 
 
 26
 The defendants argue that there was not enough evidence to convict them of defrauding lender Martha Van Sickle, who lent the LaRouche organization $250,000, because none of the representations they made to her were false. While the funds that Van Sickle lent were used for the purpose stated to her, Van Sickle testified that she was also falsely told that she would be paid in the usual manner, over a two-year period at ten percent interest per annum, and that she was not informed of events, which occurred prior to the loan, that would greatly hinder the defendants' ability to repay the loan. The evidence supports the jury's conclusion that representations made to her were false.
 
 
 27
 It is also argued that defendant Small was not adequately involved with the solicitation of a $15,000 loan from lender Goodwill Post to be convicted on Count 10. But testimony demonstrated that Small had met with Post to solicit the loan and that, after Post made the loan, Small was credited with helping to obtain it. The evidence is more than sufficient to implicate Small in soliciting the loan made by Post.
 
 
 28
 The defendants contend that the convictions cannot stand on Count 11 because it charged fraud with respect to a $10,000 loan from lender Max Harrell, who had been informed of the risks. But the record contains sufficient evidence for the jury to find that Harrell was assured falsely that he would be paid back.
 
 
 29
 The defendants argue that no evidence supports Count 12, which charges LaRouche with making false statements in a letter sent to lender Elizabeth Sexton. But evidence shows that, contrary to LaRouche's statements in the letter, the responsible entity did have the discretionary funds to repay the loan.
 
 B. Tax Fraud
 
 30
 LaRouche maintains that he could not have been convicted of Conspiracy to Defraud the IRS because no evidence was introduced to demonstrate that he had the requisite state of mind--an intent to defraud. Rather, he argues, evidence showed that he relied on the advice of tax experts. In fact, an expert witness testified to the view that he owed no taxes. Thus, LaRouche maintains, although it is arguable whether he did indeed owe taxes, it cannot be inferred that he intended to defraud the IRS.
 
 
 31
 The government introduced the following evidence:
 
 
 32
 (1) LaRouche received compensation in kind from a publishing company, even though he was not an employee;
 
 
 33
 (2) the LaRouche Organization maintained real estate for LaRouche that he and his wife referred to as "residences";
 
 
 34
 (3) the LaRouche Organization used a security fund to pay essentially all of LaRouche's personal expenses, including clothing and jewelry;
 
 
 35
 (4) when LaRouche redesigned the accounting system, he did not attempt to compile separate accounting of personal expenses;
 
 
 36
 (5) one of LaRouche's advisers wrote a memo proposing to characterize payments made to LaRouche as gifts, showing how it would affect tax liability;
 
 
 37
 (6) LaRouche and his associates justified certain payments to LaRouche by calling them "gifts";
 
 
 38
 (7) LaRouche did not file tax returns, although on two occasions an accountant had prepared returns that were not filed; and
 
 
 39
 (8) the IRS had sent LaRouche a series of notices requesting that he file returns, but no reply was ever received.
 
 
 40
 The evidence is sufficient to support the jury's conclusion that LaRouche intended to defraud the IRS.
 
 III. DENIAL OF MOTION FOR CONTINUANCE
 
 41
 At the arraignment on October 17, 1988, Judge Bryan scheduled the trial to commence five weeks later, on November 21. The only response from defense counsel was a concern expressed by one local counsel that he would be starting another trial near that date. Judge Bryan responded, "If that is the only reason for not using November 21st, we will keep it on November 21st." Defense counsel expressed no concerns that the trial would come too soon. When one defense attorney stated that the ten-day filing deadline for motions might be hard to make, Judge Bryan extended it to twenty days.
 
 
 42
 On November 4, eighteen days after the arraignment at which the trial had been scheduled, the defendants moved for a continuance of the trial date. The defense counsel argued to the district court that a continuance was necessary to allow a review of the voluminous amount of documents in the case and requested that the trial be put off until January 18, 1989. But the defense also mentioned that the Boston trial was commencing on January 3, 1989, and that conflicts might be created if the continuance was granted. The government pointed out to Judge Bryan that most of the evidentiary materials had been available to at least three of the defendants throughout the pendency of the Boston indictment, which had exceeded 18 months.
 
 
 43
 Judge Bryan denied the defendants' motion for a continuance. Although he recognized that the amount of documents in the case might impose a hardship on defense counsel, he reasoned that the extra work did not warrant a continuance. Factored into his decision was that "[m]ost of these defendants and most of these counsel have been involved in this case long before this indictment came down." The defendants filed a petition for a writ of mandamus with the Fourth Circuit to reverse Judge Bryan's denial of the motion for a continuance. On November 17, 1988, we denied the petition for mandamus.
 
 
 44
 The defendants renewed their motion for a continuance of the trial date and filed an accompanying written memorandum. On November 18, 1988, Judge Bryan declined to hear any further oral argument on the renewed motion and denied it.
 
 
 45
 The defendants contend that the district court's denial of the motion for a continuance forced the defense lawyers to go to trial in a state of unreadiness. The resulting constraint, they argue, denied them their sixth amendment rights to effective assistance of counsel and their fifth amendment rights to due process.
 
 
 46
 In order to prove an abridgment of the sixth amendment right to effective assistance of counsel based on an allegedly wrongful denial of a continuance, a defendant must first demonstrate that the district court "abused its discretion" in denying the motion. Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 1616-17, 75 L.Ed.2d 610 (1983); United States v. Lorick, 753 F.2d 1295, 1297 (4th Cir.), cert. denied, 471 U.S. 1107, 105 S.Ct. 2342, 85 L.Ed.2d 857 (1985); Hutchins v. Garrison, 724 F.2d 1425, 1432 (4th Cir.1983), cert. denied, 464 U.S. 1065, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984). Second, the defendant must show that the denial "specifically prejudiced" the defendant's case. Lorick, 753 F.2d at 1297; Hutchins, 724 F.2d at 1434. That is, in the absence of circumstances giving rise to a presumption that the defendant's case was prejudiced, the defendant must point to specific errors made by defense counsel that undermine confidence in the outcome of the trial. United States v. Cronic, 466 U.S. 648, 660-61, 666, 104 S.Ct. 2039, 2047-48, 2050, 80 L.Ed.2d 657 (1984) (when court refuses to postpone trial, only "inherently unfair" circumstances give rise to presumption of prejudice, such as actual or constructive denial of counsel's assistance); Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); see also Slappy, 461 U.S. at 27, 103 S.Ct. at 1624 (Brennan, J., concurring) (requiring showing of prejudice is appropriate for "ineffective assistance" claims because attorney's performance can be assessed, as opposed to situations in which denial of continuance results in attorney absence). The due process analysis, in this context, merges into the sixth amendment analysis; if the district court's wrongful denial of a continuance did not prejudice the defense's ability to prepare, it cannot otherwise be said here that the court deprived the defendants of a fair trial.
 
 
 47
 Application of the foregoing framework to the facts of the case leads us to conclude that the district court did not "abuse its discretion" in denying the defendants' motion for a continuance. Moreover, even assuming that the judge did abuse his discretion, the defendants have not shown a "specific prejudice" as a result of the denial of their motion for a continuance.
 
 A. Abuse of Discretion
 
 48
 Defendants contend that only "three of the seven counsel had engaged in any prior representation which was useful in understanding the nature of their client or the case," and any resulting partial familiarity was outweighed by the vast amount of material involved in such a complex case. Thus, they maintain that the district court abused its discretion in allowing them only 34 days from arraignment to the commencement of trial.
 
 
 49
 The Supreme Court has defined "abuse of discretion" in the context of a denial of a motion for continuance as "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for a delay." Slappy, 461 U.S. at 11-12, 103 S.Ct. at 1616-17. The Supreme Court has also indicated that the test for whether a trial judge has "abused his discretion" in denying a continuance is not mechanical; it depends mainly on the reasons presented to the district judge at the time the request is denied. Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).
 
 
 50
 The Supreme Court has opined that a broad and deferential standard is to be afforded to district courts in granting or denying continuances: the burdensome task of assembling a trial counsels against continuances, and, therefore, the trial courts must be granted broad discretion. Slappy, 461 U.S. at 11, 103 S.Ct. at 1616. Furthermore, the district court alone has the opportunity to assess the candidness of the movant's request. Ungar, 376 U.S. at 591, 84 S.Ct. at 850; see also United States v. Hutchison, 352 F.2d 404, 405 (4th Cir.1965) (granting continuance within sound discretion of trial judge; reasonable latitude must be allowed).
 
 
 51
 In Badwan v. United States, 624 F.2d 1228 (4th Cir.1980), cert. denied, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981), we addressed a claim that a trial court's denial of the defendants' motion for a continuance unduly prejudiced their case. The defendants argued that because their lawyer had been retained less than one month before trial and the case was exceedingly complex and document-intensive, he was not adequately prepared for trial. Id. at 1230-31.
 
 
 52
 We rejected the defendants' argument, reasoning that principally because the defense lawyer had remained silent when the trial date was announced and did not move for a continuance until eight days later, the district judge did not abuse his discretion. Id. at 1231. The later that a motion for a continuance is made, the more likely it is made for dilatory tactics; hence, it is less likely that the district court arbitrarily denied the continuance. Id.
 
 
 53
 Other than in an extreme case, a reviewing court has a seemingly impossible task in discounting the substantive complexity of a case by the number of days available for preparation (and factoring in the prearraignment experience of each of the lawyers) in order to determine whether the district court abused its discretion in denying continuance of the trial date. Such a quandary helps to explain the Badwan Court's emphasis on the process with which the judge conducted the trial rather than relying solely on an evaluation of the substantive complexity of the case.
 
 
 54
 An evaluation of the process here indicates that Judge Bryan did not "abuse his discretion." When Judge Bryan denied the defendants' motion for a continuance, he possessed a highly relevant piece of information: the defense waited eighteen days to move for a continuance. Defense counsel's prolonged silence leads to the reasonable inference that 34 days was not a clearly insufficient period of time between arraignment and trial. The fact that the defendants submitted, on the day of arraignment, a transfer motion with a 98-page analysis demonstrating the similarity between the Virginia indictment and the Boston indictment buttressed that inference. Not so much because it was affirmative proof that the cases were sufficiently similar, but because it was pertinent information showing the district court judge that the lawyers who implicitly acquiesced to his initial scheduling of the trial were well familiar with the nature of the charges, the government's evidence, and what effort a good defense would require. In the face of such silence, it cannot be said that the time allotted for trial was clearly unreasonable.
 
 
 55
 Furthermore, Judge Bryan considered the amount of preparation required but concluded that the prearraignment experience of the lawyers with the defendants and the Boston indictment somewhat mitigated his concern.[1] In addition, granting a sixty-day continuance would have created a conflict with the Boston trial, which was scheduled to begin on January 3, 1989.
 
 
 56
 It is evident that Judge Bryan did not make an "unreasoned and arbitrary demand for expeditiousness." We hold that the district court did not abuse its discretion in denying the defendants' motion for a continuance. Even assuming, however, that the district court did abuse its discretion, the defendants fail to show the second element required for the reversal of their convictions: specific prejudice.
 
 B. Specific Prejudice
 
 57
 The defendants argue that they were prejudiced at trial due to the lack of adequate preparation time in four different ways. They claim that the rush to trial: (1) contributed to the inability of any of the defendants to take the stand as they were not adequately prepared; (2) caused an inability to cross-examine the government's witnesses in an adequate manner; (3) inhibited the defense from interviewing and preparing favorable lenders to testify; and (4) prevented the defense from adequately preparing their expert witness to testify as to the economics of the organization and the tax fraud count.
 
 
 58
 As to the defendants' first claim of prejudice, they do not specifically identify why they could not take the stand. More than a general allegation of "we were not prepared" is necessary to demonstrate prejudice.
 
 
 59
 The defendants also fail to point to specific instances of shortfall in their lawyers' cross-examination that was flawed due to the denial of the continuance. Only one specific claim of lawyer error is made: further investigation revealed that two loan victims extended their loans so that they were not yet due at the time of trial. Yet even this assertion remains unsubstantiated.
 
 
 60
 As to the defendants' claim that they did not have time to find, interview, and prepare lenders who would have been favorable witnesses, their briefs again remain silent as to the names of such witnesses who have since been identified. We have previously held that "post-hoc assertions by counsel that given more time something might have turned up" will not suffice to demonstrate prejudice. Badwan, 624 F.2d at 1231.
 
 
 61
 Finally, the claimed defects in their expert's testimony do not establish prejudice. The defendants argue that the expert failed to rebut the government's contentions in several areas but they do not demonstrate that the shortcoming resulted from the lack of adequate preparation time rather than the merits of their case. The briefs are silent as to, specifically, how the expert could have testified to the contrary.
 
 
 62
 The defendants simply fail to point to specific errors made by their lawyers that resulted from the lack of adequate preparation time. While they allege that many areas of the defense could have been improved, they do not specifically state how such improvement could have been accomplished. Even assuming that the district court abused its discretion in denying a continuance, reversal of the defendants' convictions would be contrary to the Supreme Court's holding in United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Cronic mandates the identification of specific prejudice when claiming ineffectiveness of counsel due to lack of preparation time. Id. at 666, 104 S.Ct. at 2050.
 
 IV. DENIAL OF DISCOVERY REQUEST
 
 63
 Prior to trial, the defendants filed a 182-item motion for the disclosure of exculpatory information requesting, among other things, all reports and comments regarding interviews with contributors, lenders, or other witnesses, including the identification of the source from which the government obtained the name of the person. Judge Bryan denied the motion, reasoning that the request was overbroad and that the discovery already provided by the government had been adequate.
 
 
 64
 The defendants argue only that they filed a discovery request, that it was denied, and that the denial was improper. They do not state why the ruling was incorrect except that the requested information was relevant. Defendants do not state whether the ruling violated their constitutional rights or the Federal Rules of Criminal Procedure. They make no attempt to prove the claim in light of Brady v. Maryland, 73 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1983), and its progeny. They merely state that Judge Bryan's ruling was incorrect.
 
 
 65
 Criminal defendants do not have a "general" constitutional right to discovery. Weatherford v. Bursey, 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977). For example, an item that the government is required to provide must not only be exculpatory but also "material in the sense that its suppression undermines confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985). Without a more detailed argument of why the district court's ruling was incorrect, it is extremely difficult to evaluate whether their claim was meritorious, particularly when the extent of consensual discovery between the parties is not readily apparent from the record.
 
 
 66
 Judge Bryan did not deny the request because none of the items were properly discoverable; rather, he denied the request because the government had already provided all of the relevant and material information requested. For example, the government had agreed to provide any information relating to any actual interference with the defendants' ability to repay their borrowings. The defendants fail to explain how any of the requested material, aside from the discovery that had already occurred, is material, or even relevant. Judge Bryan did not abuse his discretion in denying the defendants' discovery request.
 
 V. THE DISTRICT COURT'S EVIDENTIARY RULINGS
 
 67
 The district court partially granted the government's motion in limine to exclude evidence that the United States government was the creditor who initiated involuntary bankruptcy proceedings of LaRouche organizations, although evidence of the involuntary bankruptcy was permitted. It did so also as to evidence regarding law enforcement and intelligence activities directed at the LaRouche Organization, except that the defendants were able to introduce evidence of unexpected actions by some outside influence, including the government, that had the effect of frustrating the defendants' expectation that the lenders would be repaid.
 
 
 68
 The order was granted to prevent the defendants from introducing into the trial claims such as government harassment, vindictive prosecution, and financial warfare. As the government pointed out in its motion, the only "real" jury issues stemming from the charges--fraudulent solicitations of loans made on false promises that the loans will be repaid at certain times and at specific rates--were: (1) the content of the solicitations; (2) the falsity of the solicitations; and (3) the defendants' knowledge of the content of the solicitations and the falsity. Hence, to the extent that alleged outside influences did not affect the defendants' expectation that the loans would be repaid, such evidence was excluded. As far as the identification of the United States government as the creditor who initiated involuntary bankruptcy, the court thought that any potential relevance was outweighed by the distraction that the inquiry would cause the jury, including collateral issues such as the nature of the debts owed to the United States.
 
 
 69
 The defendants argue that the order prevented them from introducing "evidence concerning long-standing efforts by the government, including the FBI and CIA, to infiltrate, investigate and conduct COINTELPRO-like operations against LaRouche." The defendants contend that evidence of expected government actions should not be prohibited because the defendants should not have to tolerate such government actions. But as the district court correctly concluded, the only possible relevance of any of the government's activities to the present case was to show that they unexpectedly affected the defendants' belief that the loans would be repaid.
 
 
 70
 The defendants also contend that, even with respect to unexpected government actions, the court improperly limited the extent to which such evidence could be introduced. But, as written, the court's limitation is nothing more than a rewording of Federal Rule of Evidence 403. Judge Bryan ordered that "the court will not allow a delving into any details of alleged infiltration ... for the reason that ... this would divert the jury from the issues raised in the indictment." At trial, the defendants point to only one circumstance in which they were not permitted to show government interference with a satisfied lender.[2] The defense lawyer argued that the lender was telephoned by "somebody who identified himself as an FBI agent" and who "suggested to [the lender] that he was maybe dissatisfied with the LaRouche Organization." The judge did not abuse his discretion in sustaining the government's objection and concluding that the testimony's probative value was substantially outweighed by the distraction it would cause.
 
 
 71
 The defendants also argue that they should have been allowed to introduce evidence that the government was the party who initiated bankruptcy proceedings. They contend that, otherwise, the jury might think that disgruntled lenders initiated the proceeding. The government asserts that if the identity of the petitioning creditor had been introduced, the government then would have had to introduce evidence regarding the amount and nature of the debts that the LaRouche Organization owed to the United States.
 
 
 72
 It is questionable whether the identity of the petitioning creditor is relevant at all. The district judge did not abuse his discretion in concluding that any relevance was outweighed by the resulting distraction caused by the collateral issues. Furthermore, the defendants violated the order and did introduce evidence that the government initiated the bankruptcy proceedings; hence, no prejudice could have possibly resulted from the court's in limine ruling.
 
 
 73
 The defendants also contend that they should have been permitted to establish at trial that the NCLC was a bona fide political organization. But the government told the jury that the defendants' political activities should not be considered and the court instructed the jury that political association was constitutionally protected. The political nature of the organization was irrelevant to the case.
 
 
 74
 Finally, the defendants assert that they should not have been prevented from introducing at trial evidence of threats made to LaRouche and others. But the validity of providing security to LaRouche was never at issue. Rather, the government questioned the classification of certain expenses as "security," such as clothing, shoes, and jewelry. The court's evidentiary rulings were proper.
 
 VI. JURY SELECTION
 
 75
 Judge Bryan conducted the voir dire for jury selection as follows:
 
 
 76
 (1) He started with a 75-person panel. Each juror filled out forms, accessible to the defendants, including personal data and information about occupation, employer, criminal record, and prior jury service.
 
 
 77
 (2) 28 people were excused on hardship grounds; 47 veniremen remained.
 
 
 78
 (3) He put a question to the group as a whole: Have you "read or heard or seen anything that has caused you to form an adverse opinion or belief about any of these defendants or about their guilt or innocence of the charges in this case?"
 
 
 79
 7 people responded and were excused; 40 veniremen remained.
 
 
 80
 (4) He put another question to the group as a whole: "Have any of you read or heard or seen anything about this case?"
 
 
 81
 28 people responded; each was individually questioned.
 
 
 82
 Following is a very typical example of the individual questioning of each that occurred at the bench:
 
 
 83
 The Court: Do you remember what it was you read or heard?
 
 
 84
 The Juror: There was an article yesterday in the Post, I believe, about the indictment and about starting the trial today. Also, some advertisements that were made by one of the defendants recently in the paper.
 
 
 85
 The Court: As a result of what you read or heard have you formed any opinion as to whether these defendants are guilty of the crime in this case?
 
 
 86
 The Juror: Not particularly, sir.
 
 
 87
 The Court: Even if not particularly--
 
 
 88
 The Juror: No.
 
 
 89
 The Court: In any way, sir?
 
 
 90
 The Juror: No, sir.
 
 
 91
 The Court: Do you think you could decide the case based on what you hear here in Court as opposed to anything you may have read about the case?
 
 
 92
 The Juror: I feel I could do my best, yes.
 
 
 93
 The Court: Do you think you could give these defendants just as fair a trial as you could if you hadn't read or heard anything about it?
 
 
 94
 The Juror: Yes.
 
 
 95
 The Court: All right, you may step down, sir.
 
 
 96
 After the individual questioning of 18 people, 7 more were excused; 33 veniremen remained.
 
 
 97
 (5) Defendants asked the judge about one woman who had not been certain when asked individual questions. The judge excused the woman; 32 veniremen remained.
 
 
 98
 (6) The judge inquired whether any juror knew any of the lawyers in the case, was connected with any relevant organizations, or knew the alleged victims. No one responded.
 
 
 99
 (7) The judge asked if any juror or any member of their families worked for a law enforcement agency.
 
 
 100
 10 responded, and each was asked about the specifics of their association with law enforcement, and whether they could remain impartial notwithstanding their relation or affiliation.
 
 
 101
 1 man with the CIA was excused.
 
 
 102
 (8) The court asked: "Do any of you harbor any resentment or feeling or prejudice against these defendants which would in any way deny them a fair and impartial trial, even though they might not have technically been within the questions I have asked? Are there any persons who harbor any form of feeling against any of these defendants that would in any way deny them a fair and impartial trial? Do you have any belief or opinion that the charges against these defendants are unique in the sense that they should be pursued with extraordinary vigor, that they shouldn't constitute an offense, or that they might carry penalties which you would consider improper? Do you know of any reason whatsoever why you cannot sit with absolute impartiality to both the Government and the defendants as trial jurors in the case?"
 
 
 103
 (No response).
 
 
 104
 (9) After objections from the defense, the judge decided to excuse two computer specialists employed by the IRS even though both stated that they could remain impartial.
 
 
 105
 (10) The defendants then exercised their peremptory challenges (each side was given 10): the government used two and the defendants used nine. Twelve jurors were impaneled.
 
 
 106
 (11) When picking three alternates from the remaining five veniremen, the government decided not to use its challenges so that the defendants could have two more peremptory challenges. Three alternate jurors were selected.
 
 
 107
 Defendants challenge the jury selection process, claiming that (1) the voir dire was inadequate to uncover juror bias, and (2) the judge improperly failed to excuse three jurors for cause thereby forcing them to use their peremptories to cure the court's mistake.[3]
 
 
 108
 Regarding the adequacy of voir dire, the defendants contend that more jurors should have been individually questioned to determine whether they harbored any bias toward the defendants. The district court only individually questioned jurors who had seen, heard, or read anything about the case, who had worked for, or had a family member work for, a law enforcement agency, or who had an accounting or tax background. Hence, the judge only put the question to the group as a whole whether they harbored a bias toward the defendants because of impressions other than pretrial publicity and law enforcement association.
 
 
 109
 At the conclusion of voir dire, Judge Bryan stated: "Gentlemen, I think I have asked enough questions to insure an impartial panel" and counsel approached the bench. They did not mention the perceived importance of broadening the questioning to probe individually anyone who had ever heard of LaRouche. They objected only to particular jurors and moved to strike them for cause. A reading of the voir dire suggests that the procedure was very interactive: the defense counsel was at the bench and gave the judge their thoughts, he considered them and often granted their requests.
 
 
 110
 Because the defense remained silent at this juncture, the government suggests that defendants waived the contention. We agree. The defendants' only possible preservation of their objection lies in the fifty-question "Proposed Voir Dire Questions" that the defendants submitted to the court. Although some of the proposed questions did seek to probe the potential jurors on information they had about LaRouche due to events other than the case, other questions appeared to be much less probative: e.g., "Do you ever feel like getting involved in government is useless because we only know what they want us to know?"
 
 
 111
 We have previously taken the view that a specific objection or request during the voir dire process is required to preserve the objection for appeal. In King v. Jones, 824 F.2d 324 (4th Cir.1987), the defense counsel had submitted 90 proposed questions to ask during voir dire but she never advised the judge which of them were necessary for an adequate voir dire and did not make a timely objection when the judge failed to ask the questions. Id. at 326. We concluded that she waived the issue even though the essential questions had been included with the others. We reasoned that otherwise a long list of questions would become a trap for an unwary judge by failing to give the judge a chance to avoid error by calling attention to the questions that must be asked. Id. (citing United States v. Blosvern, 514 F.2d 387, 389 (9th Cir.1975) (in criminal context, when counsel submitted list of 18 questions but did not object during voir dire, court declined to consider merits of objection to inadequate voir dire because particular questions which counsel deems essential must be given to court before jury selection is completed)). Because the judge was not given an opportunity to broaden the voir dire after he stated that he thought he had asked enough questions, the defendants have waived their objection.
 
 
 112
 However, even assuming the objection was properly preserved, Judge Bryan did not abuse his discretion in conducting the voir dire. See United States v. Robinson, 804 F.2d 280, 283 (4th Cir.1986) (trial court has broad discretion in conducting voir dire of jury and phrasing questions asked; it is not "abuse of discretion" for court to fail in specifically probing victims of crime for potential bias); see also Rosales-Lopez v. United States, 451 U.S. 182, 188-90, 101 S.Ct. 1629, 1634-35, 68 L.Ed.2d 22 (1981) (appellate court should not easily second-guess trial court's voir dire; judge must reach conclusion as to impartiality and credibility by relying on demeanor evidence and responses to questions). Judge Bryan individually questioned many panel members who had affirmatively responded to certain questions about possible exposure to bias, and relied on general questions to uncover any residual bias that might have remained; a reading of the transcript does not indicate an "abuse of discretion." The defendants recite statistics on voir dire time and transcript length to demonstrate that the voir dire was inadequate in comparison to the Boston trial. Such quantitative comparisons are unhelpful--the only issue is whether Judge Bryan's voir dire was sufficient to impanel an impartial jury.
 
 
 113
 The defendants also contest the district court's refusal to dismiss three veniremen for cause: (1) Andrew Mitchell, who works in the Office of Justice Program, at the Department of Justice; (2) Lenora Chapin, whose retired husband was a former Special Agent with the FBI; and (3) John Usrey, a repairman with the FBI. Although Judge Bryan individually questioned each of them to determine if they could remain impartial in spite of their relations to law enforcement agencies, he refused to strike "for cause" all employees of investigatory agencies, particularly when their association was unrelated to an investigative function.[4] Judge Bryan's ruling is consistent with case law that refuses to establish a per se rule excluding any person who has had an association with an investigatory agency. See, e.g., Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (refusing to imply bias to juror who had applied for employment with prosecuting agency); Dennis v. United States, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950) (employees of federal government not challengeable solely by reason of employment, even when defendant was prosecuted for failing to appear before Un-American Activities Committee and government employees take loyalty oath); United States v. Malloy, 758 F.2d 979, 981-82 (4th Cir.) (declining to establish per se implied bias rule when juror had served on different trial involving same offense), cert. denied, 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985).
 
 
 114
 None of the three challenged veniremen had a direct relation to any government investigative function, and Judge Bryan's questioning to determine if they could remain impartial was sufficient to ensure an impartial jury.
 
 
 115
 VII. JOINDER OF MAIL FRAUD COUNTS WITH TAX COUNT
 
 
 116
 Judge Bryan denied the defendants' motion for severance of the tax count from the mail fraud counts. He reasoned that because much of LaRouche's unreported income was derived from the alleged mail fraud, and the expenditures on LaRouche's personal needs related to the tax count as well as to the loan fraud, a sufficient nexus warranted the joinder. He also reasoned that the joinder was not sufficiently prejudicial to warrant severance.
 
 
 117
 The defendants contest the judge's finding, arguing that the prejudice resulting to the defendants was substantial because a large amount of evidence introduced at the trial would not have been admissible in both trials had there been separate trials.
 
 
 118
 Rule 8 permits joinder of offenses if they are similar in character, are based on the same act or transaction or series of transactions, or constitute parts of a "common scheme." To the extent that the proceeds from the loans, fraudulently applied to maintain LaRouche's lifestyle, also were not reported to the IRS, initial joinder was proper under Rule 8.[5]
 
 
 119
 Rule 14 of the Federal Rules of Criminal Procedure provides that a court may grant a severance from a prejudicial joinder. A trial court's decision not to sever is reviewed under the "abuse of discretion" standard. United States v. Lane, 474 U.S. 438, 449 n. 12, 106 S.Ct. 725, 732 n. 12, 88 L.Ed.2d 814 (1986); Person v. Miller, 854 F.2d 656, 665 (4th Cir.1988) (abuse of discretion only found when trial court's decision to deny severance results in "miscarriage of justice"), cert. denied, --- U.S. ----, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989).
 
 
 120
 Whether Judge Bryan abused his discretion in denying the defendants' motion for a severance and concluding that there was not significant prejudice to warrant separate trials on the mail fraud and tax fraud counts must be evaluated as follows:
 
 
 121
 The trial court must weigh the inconvenience and expense to the government and witnesses of separate trials against the prejudice to the defendants inherent in a joint trial, and its determination will not be disturbed unless the denial of a severance deprives the movant a fair trial and results in a miscarriage of justice. The movant must show something more than merely a better chance of acquittal and must overcome the burden imposed by a stringent standard of review.
 
 
 122
 United States v. Santoni, 585 F.2d 667, 674 (4th Cir.1978) (citations omitted), cert. denied, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979). We have also made clear that curative instructions given to the jury by the district court go a long way in eliminating any prejudice resulting from the spillover effects of joinder. See United States v. Porter, 821 F.2d 968, 972 (4th Cir.1987), cert. denied, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988).
 
 
 123
 There was substantial overlap between the mail fraud and tax charges: (1) at least 50% of LaRouche's unreported personal income stemmed from mail fraud; (2) the need to prove the LaRouche Organization's structure and control was present in both cases; and (3) expenditures made on LaRouche's behalf helped prove both that lenders were not truthfully told about the availability of funds and that LaRouche indeed had personal taxable income. Furthermore, 11 of 30 government witnesses testified as to both charges.
 
 
 124
 In addition, the judge on numerous occasions cautioned the jurors about the different counts and what evidence they were to consider. Because of the substantial overlap in cases and the cautionary instructions issued by the court, we conclude that there was not a miscarriage of justice and that Judge Bryan did not abuse his discretion.[6] Accord United States v. Murphy, 836 F.2d 248, 255-56 (6th Cir.) (no prejudicial spillover effect when obstruction of justice and perjury charges joined with mail fraud charges), cert. denied, --- U.S. ----, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988); United States v. Kopituk, 690 F.2d 1289, 1318 (11th Cir.1982) (RICO offenses not prejudicially joined with tax offenses, particularly because of policy in favor of joint trials in conspiracy cases), cert. denied, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983).
 
 VIII. EXCESSIVE SENTENCE
 
 125
 LaRouche has appealed the fifteen-year sentence imposed on him. He claims that, under the circumstances, the sentence is impermissibly harsh; he seeks to have the sentence modified or the case remanded for resentencing. At oral argument, his counsel maintained that, in light of LaRouche's age, the sentence is a "death sentence."
 
 
 126
 Fourth Circuit precedent holds that the eighth amendment's prohibition of cruel and unusual punishment and Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), do not require a proportionality review of any sentence less than life imprisonment without possibility of parole. United States v. Guglielmi, 819 F.2d 451, 457 (4th Cir.1987) (citing United States v. Rhodes, 779 F.2d 1019 (4th Cir.1985)), cert. denied, 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988). We recently reaffirmed the principle in United States v. Francois, 889 F.2d 1341, 1343 (4th Cir.1989) (rejecting defendant's claim that 188-month sentence constituted cruel and unusual punishment as applied to first-time offender). Because the sentence cannot be considered to violate the eighth amendment, the only question is whether the district court abused its discretion in imposing the sentence.
 
 
 127
 The court only imposed sentence on LaRouche for three of the thirteen counts; it ordered that counts 1 to 4, 5 to 8, and 9 to 13 run concurrently. We find no extraordinary circumstances here that indicate an abuse of discretion.
 
 
 128
 [S]entences imposed within the statutory limits are generally not reviewed on appeal. This Court has held that if a sentence is within the statutory limits, 'the sentence would not be disturbed unless a trial judge has grossly abused the discretion afforded him.' This Court has consistently endorsed the view that a sentence fixed within the limits approved by Congress will not be reviewed on appeal in the absence of extraordinary circumstances.
 
 
 129
 United States v. Schocket, 753 F.2d 336, 341 (4th Cir.1985) (citations omitted; emphasis added).
 
 IX. JURY INSTRUCTION
 
 130
 The government introduced evidence, in connection with LaRouche's alleged conspiracy to defraud the IRS, that housing and meals were furnished to LaRouche that constituted taxable income. In that regard, the district court instructed the jury as follows:
 
 
 131
 [T]he meals and lodging must be provided for a substantial noncompensatory purpose. Stated differently, this means that the meals and lodging cannot be provided to employees as a substitute for compensation.
 
 
 132
 LaRouche argues that the instruction was erroneous on two grounds: (1) the "substantial noncompensatory purpose" test only applies to meals, not to lodging; and (2) meals and lodging can be provided as compensation, as long as the employer otherwise meets the requirements of the Internal Revenue Code.
 
 
 133
 Section 119 of the Code provides that meals and lodging furnished to an employee may be excluded from income if they are "furnished for the convenience of the employer," and meet other requirements not relevant here. The "substantial noncompensatory purpose" test arises in the Treasury Regulations' definition of "furnished for the convenience of the employer" in the context of meals. Treas.Reg. Sec. 1.119-1(a)(2). The regulations do not explain what "for the convenience of the employer" means in the context of lodging. But there is no reason why the test would be different for meals and lodging, particularly since the same statutory text ("furnished for the convenience of the employer") controls both. The plain language of Sec. 1.119-1 of the Treasury Regulations leads to the conclusion that, in fact, the "substantial noncompensatory purpose" test animates "furnished for the convenience of the employer," and therefore applies to both meals and lodging. See Bob Jones University v. United States, 229 Ct.Cl. 340, 670 F.2d 167, 176 (1982) (defining test for "furnished for the convenience of the employer" in context of lodging as "direct nexus between the housing furnished the employee and the business interests of employer").
 
 
 134
 Regarding LaRouche's second argument, it indeed is true that if the employer does furnish meals or lodging for a "substantial noncompensatory purpose," the meals and lodging will be considered "furnished for the convenience of the employer," even though they are also furnished for a compensatory reason. Treas.Reg. Secs. 1.119-1(a)(2) and -1(b). However, "[if] an employer furnishes meals [and lodging] as a means of providing additional compensation to his employee (and not for a substantial noncompensatory business reason of the employer), the meals so furnished will not be regarded as furnished for the convenience of the employer." Treas.Reg. Sec. 1.119-1(a)(2).
 
 
 135
 The second sentence of the court's instruction could be interpreted in two ways. It could be interpreted to mean, as the defendants argue is erroneous, that meals and lodging can never be furnished because of a compensatory reason. Alternatively, it could be interpreted to mean that meals and lodging cannot be furnished solely as a means of providing additional compensation, as stated in the Treasury Regulations. If the challenged sentence is read alone, the defendants' out-of-context argument has merit. But read in conjunction with the preceding sentence, the court's instruction approximated the rule in the Treasury Regulations. Slight deviation, if there was any, was harmless. See United States v. Davis, 739 F.2d 172, 175 (4th Cir.1984) (in light of entire charge to jury, technical error in instructions harmless).
 
 X. DENIAL OF MOTION TO SUPPRESS NOTEBOOKS
 
 136
 Judge Bryan denied the defendants' motion to suppress notebooks that had been seized by the government on October 6 and 7, 1986. The defendants argue that a warrant obtained by FBI agents did not facially authorize the search and seizure of Spannaus' notebooks. Although a second search warrant did authorize the seizure, the defendants allege that an agent "exploited the information gleaned from [the initial] illegal scrutiny to bolster his affidavit for the supplemental warrant."
 
 
 137
 Both Judge Bryan and Judge Keeton, in the Boston case, found that the second search warrant was not tainted by any illegality in the initial search. Judge Keeton reasoned that it was proper for the agents to read the notebooks in executing the first search and then to use that information in obtaining the second warrant. United States v. The LaRouche Campaign, 682 F.Supp. 633 (D.Mass. Oct. 5, 1987, as amended, Mar. 31, 1988) (available on LEXIS). He held that the agents had an "objectively reasonable basis" for reading the notebooks: to determine whether they fell under the scope of the first warrant. Id. Judge Bryan found Judge Keeton's reasoning persuasive.
 
 
 138
 The defendants fail to substantiate their contention that the agents "exploited" the information unlawfully obtained in the first search to obtain the second warrant. The district court's finding that the agents had an "objectively reasonable basis" for initially examining the notebooks is not clearly erroneous. The district court made no errors in its conclusion of law: the second search warrant was not tainted when based on information lawfully obtained in executing the first warrant.
 
 XI. CONCLUSION
 
 139
 We find no infirmities in the proceedings in the district court, and, therefore, the defendants' convictions and sentences are
 
 
 140
 AFFIRMED.
 
 
 
 [1]
 Appellants contend that because the district court, eleven days before trial, granted the government's motion in limine, see infra, the resulting necessary revision of the defense strategy "drastically increased" the need for a continuance. However, that point is irrelevant because it was never presented to the district court. The defendants' "Renewed Motion for Continuance of Trial Date," filed on November 16, only reiterated the grounds that Judge Bryan had already considered on November 4, 1988; it did not mention a necessary strategic revision. When the defense counsel asked to argue that motion orally, Judge Bryan declined to hear the arguments. He thought it would be unduly repetitive. The defense lawyer, in asking Judge Bryan to reconsider denial of continuance, even said, "I know Your Honor has heard us fully." It could not have been error for Judge Bryan to refuse to hear oral argument on the subject again. Because the needed strategic revision was never presented to Judge Bryan, its existence is irrelevant in deciding whether Judge Bryan abused his discretion in denying the defendants' renewed motion for a continuance
 
 
 [2]
 All of the other objections made by the government to which appellants refer in their brief are instances in which the judge overruled the government's objections
 
 
 [3]
 The defendants also complain that juror Buster Horton was impaneled without ever answering an individual question; and, as an employee of the United States Department of Agriculture, an agency that has received extensive criticism from LaRouche, the possibility that he was biased is substantial. However, the defendants had access to Horton's employment data and should have notified the court as to its perceived significance
 
 
 [4]
 Upon request, the district court did strike two employees of the IRS for cause, primarily because evidence of an IRS search and investigation would become relevant
 
 
 [5]
 We have defined "transaction" very flexibly, as "implying a connection of logical relationship rather than immediateness." United States v. Carmichael, 685 F.2d 903, 910 (4th Cir.1982) (obstruction of justice charges for concealing activities properly joined with charges for activities themselves), cert. denied, 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983); see also United States v. Porter, 821 F.2d 968, 972 (4th Cir.1987) ("common scheme" is "series of acts unified by some substantial identity of facts or participants"), cert. denied, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988)
 
 
 [6]
 LaRouche also claims that his fifth amendment rights were violated because his own testimony was essential to the tax count but he did not want to waive his fifth amendment rights with respect to the mail fraud counts. However, such unsubstantiated allegations are easy to make and should not control disposition of the issue. See United States v. Gorecki, 813 F.2d 40, 43 (3d Cir.1987) (bare allegation that joinder prevented testimony without specific showing of what testimony might have been fails to meet stringent requirement for Rule 14 showing of prejudice)