**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SARAEUN MIN, a/k/a Saraevn B. Min,

*Defendant-Appellant.*

No. 11-4702

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARC ERIC JOHNSON,

*Defendant-Appellant.*

No. 11-4703

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAN STEVENS,

*Defendant-Appellant.*

No. 11-4704

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SENH PHUN, a/k/a Sehn Phun, a/k/a Tommy,

*Defendant-Appellant.*

No. 11-4758

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES DWAYNE MCCALISTER,

*Defendant-Appellant.*

No. 11-4795

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KHEM UN, a/k/a Khem Roeutanck Un,

*Defendant-Appellant.*

No. 11-4796

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Liam O'Grady, District Judge.
(1:10-cr-00446-LO-2; 1:10-cr-00446-LO-4;
1:10-cr-00446-LO-3; 1:10-cr-00446-LO-6;
1:10-cr-00446-LO-5; 1:10-cr-00446-LO-1)

Argued: October 25, 2012

Decided: January 3, 2013

Before DUNCAN and DIAZ, Circuit Judges, and
Catherine C. EAGLES, United States District Judge
for the Middle District of North Carolina,
sitting by designation.

---

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Diaz and Judge Eagles joined.

---

## COUNSEL

**ARGUED:** Douglas Adrien Steinberg, Alexandria, Virginia; Jonathan L. Katz, Silver Spring, Maryland; Michael Steven Arif, ARIF & ASSOCIATES, PC, Springfield, Virginia; John Louis Machado, LAW OFFICE OF JOHN MACHADO, Washington, D.C., for Appellants. Marc Birnbaum, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** John E. Gullette, Woodbridge, Virginia, for Appellant Saraeun Min; Frank G. Aschmann, ASCHMANN & ASCHMANN, Alexandria, Virginia, for Appellant Khem Un. Neil H. MacBride, United States Attorney, Mary K. Daly, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

Senh Phun organized a group of associates to steal cocaine from the stash house of a drug cartel. Phun, along with

Saraeun Min, Khem Un, Marc Eric Johnson, Jan Stevens, and James Dwayne McCalister (collectively, the "defendants") conspired to commit the robbery, but were arrested just before they could attempt to complete the object of their conspiracy. In fact, unbeknownst to the defendants, the stash house and the cocaine never existed, but were rather a fiction created by undercover law enforcement officers. After a joint trial, each defendant was convicted on several counts related to his participation in the conspiracy. The defendants now challenge multiple aspects of the trial and their respective convictions. Having fully considered the defendants' contentions, we affirm the judgment of the district court.

I.

A.

In 2010, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents began laying the foundation for a sting involving Phun. Based on information that Phun was dealing in narcotics, large quantities of marijuana, and contraband cigarettes and had previously discussed committing robbery, agents established undercover identities and, over a series of meetings, sold Phun contraband cigarettes in exchange for cash and marijuana.

At one such meeting, Detective Robert Snyder presented Phun with an opportunity to rob a drug stash location in Virginia. Snyder explained that he and his "partner" had been buying five kilograms of cocaine at a time for their "boss," that the cocaine supplier had recently failed to supply two kilograms, and that it was imperative he retrieve this missing cocaine from the supplier's stash house. This was all fiction: there was no "boss," no missing cocaine, and no stash house. But Phun took the bait and agreed to assemble a crew to undertake the robbery.

The plan was for Phun's crew to steal whatever was at the stash house, which they were told repeatedly would be

between five and ten kilograms of cocaine, and some unknown amount of cash. Snyder would receive the two kilograms of cocaine he owed his boss, and the crew would keep whatever else they were able to seize.

On October 28, 2010, the day the robbery was to occur, every defendant except Phun, who never intended to participate directly, drove to a storage facility in Virginia. There they met undercover agents waiting with a van to execute the robbery. While McCalister and Stevens remained in the defendants' rented SUV, Johnson, Min, and Un got out and discussed final details with the agents. Snyder reiterated, "[A]ll's I want is my two. There would be like at least ten in there." S.A. 96. Johnson responded, "It's ten and cash, right?" S.A. 98. The group then discussed whether and to what extent the stash house traffickers would be armed, and Snyder asked, "You got your shit though, right?" S.A. 98. All three responded in the affirmative.[1] After Snyder suggested that the crew load the van, McCalister and Stevens got out of the SUV and transferred items concealed under their clothing into the van. The agents observed McCalister and Stevens taking apart plastic molding in the van and lifting up some of the floorboards. Finally, Snyder asked all five defendants present whether they were ready to carry out the robbery, and they all nodded yes.

Shortly thereafter, law enforcement moved in on the parking lot, arresting the defendants and recovering five loaded firearms from the wheel wells of the van. Min alone waived his *Miranda* rights and confessed to his involvement in a plan to rob a drug trafficker of cocaine and money. Phun was arrested later that day in Philadelphia.

---

[1]Johnson said, "Oh yeah, we got it," Min said, "We got enough," and Un said, "We got something that they will see." S.A. 99.

## B.

The six defendants were each indicted on three counts: (1) conspiracy to interfere with interstate commerce by robbery, 18 U.S.C. § 1951(a); (2) possession of firearms during a crime of violence, 18 U.S.C. § 924(c); and (3) conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine, 21 U.S.C. § § 841(a)(1), 846.

After the district court denied defendants' motions to sever, all six defendants were tried jointly and Min's redacted confession was introduced against him with a limiting instruction. The government had replaced the names of any defendants except Min with non-specific terms such as "another person," "a third person," "others," and "one of the others," and had written the statement from the perspective of an officer interviewing Min. *See, e.g.*, J.A. 103 ("MIN stated the following: At approximately 9:00 p.m. the night before, another person asked MIN if he would take a trip the next day to 'take care of business,' which MIN understood to mean that they were to pick up some drugs in Virginia. To MIN's knowledge, this other person was making the trip at the request of a third person."). None of the defendants testified at trial. Detective Snyder testified extensively about his understanding of recorded conversations he had with Phun in the course of planning the robbery.

Phun, Un, Min, and Johnson were convicted on all three counts; Stevens and McCalister were convicted on counts one and two only. All six defendants timely appealed.

## II.

## A.

We first address whether the district court erred in denying the five non-confessing defendants' motions to sever and

admitting the redacted confession of their non-testifying codefendant, Min, in the resulting joint trial. We review the decision to deny a motion to sever for abuse of discretion, though we review whether the admission of evidence violated the Confrontation Clause de novo. *United States v. Lighty*, 616 F.3d 321, 348, 376 (4th Cir. 2010).

Generally, defendants may, and indeed should, be indicted and charged together if they are alleged to have participated in the same act or transaction. *See* Fed. R. Crim. P. 8(b); *Zafiro v. United States*, 506 U.S. 534, 537 (1993). When such defendants have been joined properly under Rule 8(b), a district court should grant severance under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Although limiting instructions often will suffice to cure any risk of prejudice as a result of the joint trial, in some situations the risk of prejudice is so high as to require a separate trial. *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996).

Such a situation can arise where the out-of-court confession of a non-testifying codefendant, admissible against himself but inadmissible hearsay against anyone else, inculpates one or more of the other defendants. In *Bruton v. United States*, the Supreme Court acknowledged that the prejudice resulting from the introduction of a non-testifying codefendant's confession that directly implicates the defendant is so severe that even when the jury is instructed to consider the confession only against the codefendant, the other defendant's Sixth Amendment right to confrontation is necessarily violated. 391 U.S. 123, 135-37 (1968) ("[W]here the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial . . . we cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination.").

   Subsequent decisions have refined *Bruton*'s holding signifi-
cantly. First, in *Richardson v. Marsh*, the Supreme Court held
that the Confrontation Clause is not implicated so long as the
codefendant's confession, accompanied by a limiting instruc-
tion, "is redacted to eliminate not only the defendant's name,
but any reference to his or her existence." 481 U.S. 200, 211
(1987). This is true even when the confession "inferentially
incriminates" the defendant because other evidence admitted
subsequently at trial clearly links the defendant to the state-
ment in an inculpatory manner. *Id.*[2]

   The Supreme Court later clarified that a codefendant's con-
fession is facially, not inferentially, incriminatory if it "re-
place[s] a proper name with an obvious blank, the word
'delete,' a symbol, or similarly notif[ies] the jury that a name
has been deleted." *Gray v. Maryland*, 523 U.S. 185, 195 (1998).[3]
The Court reasoned that redaction which directly reveals the
existence of the non-confessing defendant prejudices him in
much the same way as the direct accusation in *Bruton*. Under
*Gray*, a confession is "facially incriminatory," and thus inad-
missible even with a limiting instruction, where the inferences
required to link the statement to the defendant are of the type

---

[2]Specifically, in *Richardson*, the codefendant's statement recounted his
conversation with another person during the car ride on the way to the
scene of the crime, in which they planned the details of the crime. 481
U.S. at 208-11. When a third person and the confessing codefendant were
tried jointly, the statement was redacted to eliminate all mention of the
fact that the defendant had been in the back seat of the car at the time.
Later, the defendant herself testified that she was in the car, which implied
she had heard the conversation described in the confession, and knew of
the plan to commit the crime. The Supreme Court deemed the confession
admissible (with a limiting instruction), reasoning that where "such link-
age is involved, it is a less valid generalization that the jury will not likely
obey the instruction to disregard the evidence. Specific testimony that 'the
defendant helped me commit the crime' is more vivid that inferential
incrimination, and hence more difficult to thrust out of mind." *Id.* at 208.

[3]The codefendant in *Gray* "responded to the question 'Who was in the
group that beat Stacey,' with the phrase, 'Me, [space], and a few other
guys.'" 523 U.S. at 192.

"that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* at 196.

The Supreme Court has yet to face a situation in which a confession's reference to other defendants is less obvious than a blank space, such as where defendants' names are replaced with generic pronouns. However, taking our cue from hints in *Gray*,[4] we have held admissible a codefendant's redacted statement that referred to the existence of another person through neutral phrases. *United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir. 1999). In that case, each of two codefendants made an out-of-court statement implicating the other. The statements were altered by replacing the defendants' respective names with the phrases "another person" or "another individual." *Id.*

By concluding that the admission of these redacted statements did not offend *Bruton* and affirming the district court's denial of the defendants' motions to sever, *Akinkoye* dictates our decision here. Unlike in *Gray*, the obfuscation of the names of other defendants in the version of Min's confession admitted at trial was not obvious. Written in the third person and in grammatically correct phrases, the redacted confession referred generally and without facial incrimination to some number of individuals who could, or could not, be the other defendants.[5] The statement did not implicate any one defen-

---

[4]In his majority opinion in *Gray*, Justice Breyer wrote: "Why could the witness not, instead, have said: . . . 'Me and a few other guys?'" 523 U.S. at 196. Notably, Justice Breyer's suggestion does not, strictly speaking, *replace* the defendant's name with the neutral term, "a few other guys," because that term was in the original statement. Instead, it merely deletes all reference to the defendant in a way that makes grammatical sense but does not render the redaction obvious, as in *Richardson*.

[5]Although the confession strongly corroborated other inculpatory evidence presented at trial, we reiterate that confessions do not become facially incriminatory when the government introduces evidence at trial that links the confession to other defendants. To allow as much would offend *Richardson*, which rejected a rule requiring judges to weigh the evidence to be presented at trial in order to rule on the admissibility of a confession. 481 U.S. at 210.

dant in particular, nor did it leave the jury to fill in any obvious blanks. For these reasons, we conclude that the district court did not abuse its discretion by denying defendants' motions to sever, and that Min's redacted confession was properly admitted against him with a limiting instruction.

B.

Next, we turn to defendants' impossibility argument, a major focus of their challenge. That the stash house, drugs, and entire factual premise of the robbery were the fictional creation of law enforcement officers, they argue, should be a defense to their conspiracy charges. This argument takes several forms. Primarily, defendants assert that factual impossibility renders the evidence against them insufficient. They also contest the district court's decision to prohibit defense counsel from arguing impossibility during closing argument, and challenge the exclusion from the jury instructions of impossibility as a defense. Because each of these arguments relies on the same premise, we first address defendants' underlying legal argument as a whole, concluding that factual impossibility is not a defense to the crime of conspiracy. We then discuss more specifically the sufficiency of the evidence in this case.

1.

We have yet to face the question of whether factual impossibility is a defense to the crime of conspiracy. The fundamental tenets of conspiracy law, however, in addition to the persuasive reasoning of several of our sister circuits, compel our determination that it is not.

It is well-established that the inchoate crime of conspiracy punishes the agreement to commit an unlawful act, not the completion of the act itself. *See United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003). Indeed, in the specific context of conspiracies to distribute cocaine in violation of 21

U.S.C. § 846, not even a single overt act in furtherance of the conspiracy is required. *United States v. Shabani*, 513 U.S. 10, 15 (1994). Because "special conspiracy-related dangers remain" apart from the danger of attaining the particular objective, impossibility does not terminate conspiracy. *Jimenez Recio*, 537 U.S. at 275.

In *Jimenez Recio*, the Supreme Court held that the charge of conspiracy was not defeated where police actions frustrated the conspiracy's specific objective before its completion without the conspirators' knowledge. *Id.* That holding extends naturally to the present case, where the police had defeated the criminal objective from the beginning, by inventing it. *Cf. United States v. Belardo-Quinones*, 71 F.3d 941, 944 (1st Cir. 1995) ("There is no basis for making a distinction between those who start a conspiracy that is impossible from the beginning and one who joins a conspiracy that has become impossible due to intervening events unknown to the conspirators."). Defendants have offered no convincing reason to distinguish the type of impossibility deemed irrelevant to conspiracy in *Jimenez Recio* from the type of impossibility we confront here.

In addition, several of our sister circuits have faced similar "stash house sting" cases in which law enforcement agents fabricated the existence of drugs, and all have concluded that factual impossibility is not a defense to the inchoate offense of conspiracy. *See, e.g.*, *United States v. Corson*, 579 F.3d 804, 810 (7th Cir. 2009) ("Though it might seem odd, the fact that the stash house, the drugs—indeed the whole plot—was fake is irrelevant. That the crime agreed upon was in fact impossible to commit is no defense to the crime of conspiracy. The crime of conspiracy is the agreement itself.") (internal citations omitted); *United States v. Orisnord*, 483 F.3d 1169, 1177 (11th Cir. 2007); *United States v. Rodriguez*, 360 F.3d 949, 957 (9th Cir. 2004); *see also United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987) (finding factual impossibil-

ity irrelevant to crime of conspiracy to import cocaine orchestrated by DEA agents). We agree.[6]

2.

Defendants' related insufficiency of the evidence claims merit brief individual mention. In addition to our conclusion that the impossibility of the conspiracy's objective did not render the evidence insufficient as a matter of law, we also find that the evidence was more than sufficient to sustain each conviction on these particular facts.

We review the sufficiency of the evidence to support a conviction under a substantial evidence standard, which requires us to view the evidence in the light most favorable to the government and inquire whether a reasonable finder of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Hackley*, 662 F.3d 671, 683 (4th Cir. 2011). Defendants argue the evidence established neither the amount of cocaine defendants conspired to steal nor the possession of firearms. We review the evidence introduced to prove each element, and find it supports the jury's verdict as to both beyond a reasonable doubt.

---

[6]We also reject defendants' argument that they were prejudiced by the district court's reprimand of Un's counsel during summations. District courts have wide discretion in managing the conduct of attorneys appearing before them. *See United States v. Singleton*, 107 F.3d 1091, 1103 (4th Cir. 1997). While defendants may not like the manner in which the court exercised its discretion, Un's counsel had fair warning not to argue impossibility during summations. He chose to do so anyway. In addition, the court gave an instruction that the jury should not consider the court's admonishment in weighing the evidence. We must presume the jury followed that instruction. *Richardson*, 481 U.S. at 206. Accordingly, defendants have failed to show any prejudice resulting from the district court's rebuke of Un's counsel.

a.

Contrary to defendants' assertions, there was ample evidence to establish that the conspiracy involved more than five kilograms of cocaine. The testimony of undercover agents, as well as recorded phone calls and meetings, fully supported the conclusion that the plan was to steal at least five (usually between seven and ten) kilograms of cocaine from the stash house, and that the defendants[7] knew it.

Unlike in *United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010), upon which defendants rely, the evidence here does not invite speculation as to the quantity of narcotics involved. In *Hickman*, we carefully reviewed all of the evidence of actual amounts of heroin seized or known about in the course of a charged four-month conspiracy, and even making all assumptions of dilution and quantity in favor of the government, concluded it fell short of one kilogram. *Id.* at 764-66. We rejected the government's theory that the amount should be inflated based on 25,000 empty vials found in the defendant's possession or the conspirators' apparent familiarity with the drug trade. *Id.* at 767.

In the present case, we need not engage in such calculations and estimations because, unlike in *Hickman*, the evidence introduced was replete with references to the amount of cocaine the defendants conspired to steal. *Hickman* does not stand for the proposition that all evidence of drug amounts for conspiracy charges must be proved by actual seized evidence. To the contrary, we considered evidence of several merely hypothetical transactions in calculating the total amount of heroin in *Hickman*.[8] What *Hickman* requires, and what we

---

[7]Only four of the defendants, Phun, Un, Min, and Johnson, were convicted on count three of conspiracy to possess five or more kilograms of cocaine. Presumably only they join in challenging the sufficiency of the evidence of the quantity of drugs to be stolen.

[8]For example, there was evidence that at one point two of the coconspirators spoke about attempting to "do the same thing again." *Id.* at 766.

have here in abundance, is evidence of the amount of drugs the conspiracy intended to possess and distribute, sufficient to convict on count three.

b.

Similarly, there was a wealth of evidence that the defendants planned to possess firearms while committing the robbery, and did possess them in furtherance of the conspiracy. Again, Detective Snyder's testimony, corroborated by recordings of phone calls and meetings, repeatedly established that the plan was to commit an *armed* robbery of a drug stash location. Further, there was specific evidence that on October 28, 2010, the defendants in fact possessed and carried five firearms to the staging point of the robbery.

Defendants' focus on who owned the van in which the firearms were found, in reliance on *United States v. Blue*, 957 F.2d 106 (4th Cir. 1992), misses the point. That case concerned whether the defendant had dominion and control over a gun located under the driver's seat of a car sufficient to establish constructive possession, because the government produced no evidence that the defendant actually possessed the firearm. The evidence in the present case presents no real question of dominion and control. There was evidence that defendants maintained the guns in their rented SUV until they arrived at the rendezvous point, when defendants Stevens and McCalister moved them to the police van in anticipation of committing the planned robbery. This evidence fully supports the jury's verdict on count two.[9]

---

Even though there was no evidence of the amount of heroin they intended to seek, nor whether they actually did "do the same thing again," we assumed the jury believed they did, and added to the conspiracy's total the same number of grams as were involved in a previous transaction for which there was evidence of the amount. *Id.*

[9]Defendants additionally argue that the court erred in allowing the jury to convict on count two under a *Pinkerton* liability theory, by which a

***

In sum, we join our sister circuits in holding that factual impossibility is not a defense to conspiracy. Defendants' agreement to commit an unlawful act is a "distinct evil," *Jimenez Recio*, 537 U.S. at 274 (citation omitted), which Congress has chosen to punish separate and apart from actual commission of the act. Accordingly we reject defendants' arguments that the factual impossibility of the robbery they conspired to commit renders their convictions legally insupportable. We also find that the evidence was more than sufficient to establish the amount of cocaine the defendants conspired to possess, as well as their possession of firearms in furtherance of the conspiracy.

## C.

Next, defendants challenge the district court's decision to permit Detective Snyder to testify at trial regarding conversations he had with Phun while setting up the sting. For example, Snyder explained Phun's use of shorthand in the following excerpt on direct examination:

---

member of an unlawful conspiracy is held criminally responsible for any acts his coconspirators undertook in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640 (1946). Defendants' argument relies on the indictment's failure to specify conspiracy for count two. However, defendants mischaracterize vicarious liability, which need not be charged in an indictment because it merely describes the way in which a defendant's conduct violated the particular law charged. *See United States v. Wills*, 346 F.3d 476, 495 (4th Cir. 2003). Furthermore, defendants' argument is specifically foreclosed by *United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010) ("Because we hold that an indictment need not set forth vicarious coconspirator liability, it was not error for the district court to instruct the jury on this theory."). As members of the conspiracy, all of the defendants, including Phun, were legally responsible for the possession of firearms, which was a reasonably foreseeable act by their coconspirators in furtherance of that conspiracy. *Pinkerton*, 328 U.S. at 646-48.

Q: Mr. Phun [said]: "I'm expecting the worst. . . . [M]aybe you need somebody . . . taken out. That would actually be easy for me[.]" What did you understand Mr. Phun to be saying to you at that point in the conversation?

A: I understood Mr. Phun to be saying that it would be easier for him to kill these subjects rather than to get the cocaine back. It would be easier for him just to kill them. . . . Taking out means kill.

J.A. 463-64. Defendants assert that this sort of "narrative gloss" testimony is improper under Federal Rule of Evidence 701, which permits lay witness opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. We disagree.

Reviewing the district court's admission of evidence for abuse of discretion, *Lighty*, 616 F.3d at 351, we find that each of Rule 701's requirements is satisfied here.[10] First, Snyder's testimony was rationally based on his perception. Crucially, he had been a participant in each of the conversations about which he testified. This contrasts with *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010), upon which defendants rely, in which we held inadmissible an agent's "post-hoc assessments" about a conversation she had not participated in, reasoning that her opinions were not based on her perception. Unlike the agent in *Johnson*, here Snyder developed his own understanding of what Phun meant, which was rationally based on his general knowledge, the context, and Snyder's past conversations with Phun.

---

[10]The defendants do not contest, and we find, that Snyder's testimony met Rule 701's second requirement, as it was undoubtedly helpful to the jury's ability to understand the conversations.

Similarly, Snyder's testimony easily meets Rule 701's third requirement. The kinds of questions asked and answers elicited went directly to Snyder's personal knowledge based on his having participated in that conversation, and others, with Phun, rather than calling upon any specialized expertise he might have.[11] For example, Snyder testified that he understood Phun to mean "kilograms of cocaine" when he said "bricks" because that was how the term had been used in a previous conversations. J.A. 483. Accordingly, Snyder's testimony, which was rationally based on his own personal perception, was properly admitted.

## D.

Lastly, we address Phun's final argument[12] that the correction of an error in his verdict form during the jury's deliberations constituted reversible error.[13] In reviewing allegations of improper influence on the jury, we may affirm the judgment "only if there is no reasonable probability that the practice complained of might have contributed to the conviction." *United States v. Camacho*, 955 F.2d 950, 955 (4th Cir. 1992).

Turning first to summarize the circumstances surrounding the allegedly improper influence, we note that the record is far from clear on these events. It appears that, at some point after

---

[11]Even if we were to follow the Ninth Circuit's approach in *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (holding inadmissible an agent's testimony that certain activities were consistent with those of an experienced drug trafficker), there is no indication that Snyder gave any testimony similar to that in *Figueroa-Lopez* based on the specialized knowledge of a law enforcement officer.

[12]Phun's other individual allegations of error in sentencing are plainly meritless, and we reject them without discussion.

[13]Although Phun alone moved for mistrial on this basis below, all six defendants apparently join in the argument on appeal. Even if the argument is not waived for the other five defendants, we discuss prejudice to Phun only because the others have failed to articulate any claim of individual prejudice.

the jury began deliberations but before it reached a verdict, the government alerted the court to a typo on Phun's verdict form. For count three only, Un's name appeared where Phun's name should have. The district court created a corrected version of the form, and was prepared to send that form back to the jury. Around that time, someone—perhaps without the court's knowledge—sent the court security officer ("CSO") to determine if the jury had written on Phun's erroneous form. The CSO returned and indicated, in the presence of at least one defense counsel, that the jury had marked the form.

The district court asked counsel to convene in open court. Phun's counsel requested Phun's presence, but the court denied the request because the U.S. Marshals were unable to comply at that time, and the court was uncomfortable with allowing the jury to continue its deliberations with an erroneous verdict form for any longer than necessary. Phun's counsel then indicated he had no objection to the contents of the corrected form itself, but rather took issue with the fact that the verdict form being replaced had been marked by the jury. He argued that it would be confusing and prejudicial to leave the erroneous form in the jury room, but would also be prejudicial to remove the jury's notes from them. The court overruled Phun's counsel's objections and denied his motion for a mistrial.[14]

The court adjourned, and the CSO retrieved the original marked-on form and gave the jury the corrected form. About

---

[14]Phun's arguments on appeal echo his motion for a mistrial. Specifically, Phun complains that he was not given notice before the CSO initially "invaded the jury's province" by entering the deliberation room and inquiring about the form. Further, he challenges the district court's refusal to give a curative instruction to the jury indicating that the defendants were not the source of the correction, so as to "avert the jury's holding such a change against the defense." Appellants' Br. at 54. Finally, he objects to the district court's refusal to call the CSO as a witness to testify about what was said in the jury room.

an hour later, the jury indicated it had reached a unanimous verdict. Before the jury returned to the courtroom, the district court allowed counsel for both sides to view the original form. The court also read the form's contents aloud in open court, indicating that the jury had checked the spaces labeled "guilty" beside counts one and two, but had not yet filled out the space beside count three, which contained the error.

Defendants fail to identify and we fail to see how any of these events could have improperly influenced the jury. The district court acted properly by quickly correcting a substantial error on the jury form, although the methods it used were admittedly less than ideal. In particular, we note with concern the lack of a transparent and full record regarding these events; the apparent lack of notice to defense counsel prior to the CSO's first interaction with the jury; and the district court's decision, without explanation, to read the jury's markings on the erroneous verdict form aloud in open court. However, we are sympathetic to the district court's position, particularly given the complete lack of cooperation by Phun's counsel in the face of an immediate need for action. Instead of facilitating a mutually agreeable solution, Phun's counsel chose to object on every possible basis, rejecting both correction and non-correction of the erroneous form. And his requests to interview the CSO and for a curative instruction explaining that the error was not the fault of the defendants were properly denied as unrelated to any improper influence on the jury.

Ultimately, we find that, even if some improper influence unclear from the record constituted error, it was harmless. Based on the unique facts of this case, no reasonable probability exists that the events at issue influenced the jury's decision to convict Phun on all three counts. Phun has not provided any coherent explanation for how such an influence could have manifested, and the abundance of evidence supporting the jury's verdict bolsters our conclusion. Accordingly, we

can find no reason to overturn any of the defendants' convictions.

## III.

For the reasons set forth herein, the judgment below is

*AFFIRMED*.