**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-4288

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALLEN G. SAOUD,

Defendant - Appellant.

Appeal from the United States District Court for the Northern
District of West Virginia, at Clarksburg. Irene M. Keeley,
District Judge. (1:12-cr-00113-IMK-JSK-1)

Argued: October 31, 2014          Decided: December 19, 2014

Before DUNCAN, WYNN, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion. Judge Duncan wrote the
opinion, in which Judge Wynn and Judge Diaz joined.

**ARGUED:** Paul J. Harris, Wheeling, West Virginia, for Appellant.
Andrew R. Cogar, OFFICE OF THE UNITED STATES ATTORNEY,
Clarksburg, West Virginia, for Appellee. **ON BRIEF:** Robert
McCoid, MCCAMIC, SACCO & MCCOID, P.L.L.C., Wheeling, West
Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Following a ten-day trial, a jury convicted Dr. Allen G. Saoud of thirteen counts of health care fraud and nine related offenses. The district court sentenced Dr. Saoud to 99 months' incarceration, imposed a $2,630,000.00 fine, and ordered him to forfeit $1,243,118.29.

Dr. Saoud argues on appeal that the district court erred by denying his motion to either sever the charges against him or continue the trial date, that insufficient evidence supported many of his convictions, that jury misconduct denied him a fair trial, that the district court erred at sentencing when calculating the financial loss Dr. Saoud intended to cause, and that the district court's forfeiture determination was erroneous. For the reasons that follow, we affirm.

I.

A.

Dr. Saoud founded AGS, Inc., a dermatology practice in West Virginia, in 1994. Roughly ten years later, the United States Department of Health and Human Services began investigating whether Dr. Saoud had submitted false bills to Medicare or Medicaid. In May 2005, while the investigation was ongoing, Dr. Saoud established Central West Virginia Dermatology Associates ("CWVD"), Inc., as a new dermatological practice at the same

location as AGS. In August 2005, Dr. Saoud, without admitting liability, entered into a settlement agreement that excluded him for ten years from participating in Medicare, Medicaid, and all other federally sponsored health care programs. The agreement specifically prohibited Dr. Saoud from, among other things, billing federal health care programs "for items or services, including administrative and management services, furnished, ordered, or prescribed by Dr. Saoud during the exclusion." J.A. 147; accord Appellant's Br. at 5-6. The agreement also effectively prohibited Dr. Saoud from owning more than five percent of a medical practice that billed a federal health care program, and from exercising operational or managerial control over such a practice.

The government alleged below that Dr. Saoud committed four categories of crimes in an attempt to circumvent the terms of the agreement. First, he split his practice into two entities-- AGS and CWVD--and then took various steps to hide his ownership and managerial interests in those entities. Most directly, Dr. Saoud executed a series of sham transactions appearing to transfer his interests in AGS and CWVD to various colleagues. Second, Dr. Saoud caused CWVD to use without permission another doctor's name to bill insurance companies, including a Medicare contractor, for dermatological pathology services. Third, after filing for bankruptcy on behalf of AGS in May 2009, Dr. Saoud

3

testified falsely at a deposition and creditors meeting by downplaying his involvement with both AGS and CWVD, and emphasizing the distinction between the two entities. Fourth, in October 2009, Dr. Saoud sent a letter to an Internal Revenue Agent in which he stated falsely that he was not an officer of AGS and had no relationship with CWVD after selling it in August 2005.

B.

In December 2012, a federal grand jury sitting in the Northern District of West Virginia returned a twenty-three-count indictment charging Dr. Saoud with, among other offenses, five counts of health care fraud, one count of concealing a material fact in a health care matter, one count of corruptly endeavoring to obstruct and impede the due administration of the internal revenue laws, twelve counts of making a false oath or account in relation to a bankruptcy case, and one count of making a false statement to a federal agent. In May 2013, the grand jury returned a superseding indictment that charged no additional offenses.

On June 4, 2013--eight days before trial was to commence-- the grand jury returned a second superseding indictment, which added eight new health care fraud charges and a related charge of aggravated identity theft. The nine new counts alleged that Dr. Saoud caused CWVD to bill insurance companies in the name of

4

Dr. Frank Swisher, a practitioner of family medicine, for dermatological pathology services that an outside lab actually performed.

On June 6, 2013, Dr. Saoud moved to sever the nine new counts or, in the alternative, for a continuance. The next day, the district court heard oral argument. Dr. Saoud argued that having only eight days to review the new charges would prejudice his defense because he would have insufficient time to (1) review the 200,000 pages of discovery for evidence related to the new charges, or (2) determine whether Dr. Saoud wrongfully caused CWVD to use Dr. Swisher's identity. The government responded that (1) it had identified for Dr. Saoud the relevant insurance and lab invoices, and (2) it would rely on those invoices and Dr. Swisher's testimony to prove that CWVD improperly used Dr. Swisher's identity and that Dr. Saoud orchestrated the scheme. The district court denied Dr. Saoud's motion to sever or continue after finding that "no undue prejudice [would] result if [the] trial proceed[ed] as scheduled." J.A. 2442.

C.

Dr. Saoud's trial began on June 12, 2013. On the seventh day of trial, the government and Dr. Saoud delivered their closing arguments and the district court submitted the case to the jury. On the ninth day, the district court replaced one of

5

the jurors with an alternate. The following day, the court replaced that alternate juror with a different alternate. The district court then instructed the jury to "go back to the beginning to make sure that the new juror ha[d] an opportunity to be heard on every one of the[] issues that [the jury] may have resolved." J.A. 1983. The reconstituted jury retired to deliberate at 12:35 p.m.

At 2:52 p.m., the district court announced that the jury had reached a verdict. The jury convicted Dr. Saoud of thirteen counts of health care fraud, one count of aggravated identity theft, one count of concealing a material fact in a health care matter, one count of corruptly endeavoring to obstruct and impede the due administration of internal revenue laws, five counts of making a false oath or account in relation to a bankruptcy case, and one count of making a false statement to a federal agent.

On March 25, 2014, the district court sentenced Dr. Saoud to 99 months of incarceration, imposed a $2,630,000.00 fine, and ordered him to forfeit $1,243,118.29. This appeal followed.

II.

Dr. Saoud mounts five challenges on appeal: to the denial of his motion to sever or continue; to the sufficiency of the evidence supporting the jury's verdict; to the fairness of the

trial in light of alleged jury misconduct; to the loss amount calculated at sentencing; and to the forfeiture determination. We consider each argument in turn, incorporating additional facts when necessary to our analysis.

## A.

Dr. Saoud's primary argument on appeal is that the district court erred by denying his motion to sever or continue. See Oral Arg. at 6:35–54 ("The thrust really of this appeal is the . . . abuse of discretion by the trial court in refusing to grant either a severance or a continuance after the second superseding indictment was returned eight days before trial."). To prevail on this ground, Dr. Saoud must make two showings. First, he must demonstrate that the district court abused its discretion by denying his motion. See United States v. Copeland, 707 F.3d 522, 531 (4th Cir. 2013) (motion for continuance); United States v. Min, 704 F.3d 314, 319 (4th Cir. 2013) (motion to sever). Second, Dr. Saoud must show that the district court's erroneous decision prejudiced his defense. See United States v. Dinkins, 691 F.3d 358, 368 (4th Cir. 2012) ("We will not reverse a denial of a motion to sever absent a showing of clear prejudice."); United States v. Williams, 445 F.3d 724, 739 (4th Cir. 2006) ("[A] trial court's denial of a continuance is . . . reviewed for abuse of discretion; even if such an abuse is found, the defendant must show that the error specifically prejudiced her

7

case in order to prevail." (quoting United States v. Hedgepeth, 418 F.3d 411, 419 (4th Cir. 2005))(internal quotation marks omitted)).

Dr. Saoud has not established reversible error because he has not shown how the denial of his motion prejudiced his defense. Dr. Saoud contends on appeal that he lacked adequate time to "prepare a defense to the [new] counts," "review the over 200,000 pages of discovery documents in this case with relation to the additional nine counts," "interview the witnesses contained in the additional nine counts," or "hire an expert related to issues surrounding the laboratory." Appellant's Br. at 17. But he does not explain, as he must, how his inability to do these things specifically prejudiced his defense. Our precedent establishes that an appellant cannot demonstrate prejudice with "a general allegation of 'we were not prepared,'" United States v. LaRouche, 896 F.2d 815, 825 (4th Cir. 1990), or "post-hoc assertions by counsel that given more time something might have turned up," id. (quoting United States v. Badwan, 624 F.2d 1228, 1231 (4th Cir. 1980)) (internal quotation marks omitted). Even at oral argument, with the benefit of hindsight, Dr. Saoud could identify no specific source of prejudice.

Dr. Saoud has presented no reason to believe that the outcome of his trial might have been different had the district

court granted his motion to sever or continue. We therefore find no reversible error in the district court's decision to deny Dr. Saoud's motion.[1]

## B.

Dr. Saoud next argues that insufficient evidence supported his convictions for committing health care fraud, making a false oath or account in relation to a bankruptcy case, corruptly

---

[1] We reject Dr. Saoud's contention that the district court committed reversible error by holding trial fewer than thirty days after the grand jury returned the second superseding indictment. In making this argument, Dr. Saoud relies on 18 U.S.C. § 3161(c)(2), which provides that a "trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se" unless the defendant so consents. Dr. Saoud's reliance on this subsection is misplaced because § 3161(c)(2) "clearly fixes the beginning point for the trial preparation period as the first appearance through counsel," not "the date of the indictment" or "any superseding indictment." United States v. Rojas-Contreras, 474 U.S. 231, 234 (1985).

We are also unpersuaded by Dr. Saoud's argument, made in the portion of his brief devoted to the district court's denial of his motion to sever or continue, that the district court "added to the miscarriage of justice" by "improperly instruct[ing] the jury" on the aggravated identity theft count. Appellant's Br. at 17. Dr. Saoud maintains that the district court "erroneously enlarged [his] burden to defend against the identity theft allegations" by instructing the jury that it could convict Dr. Saoud if it found that he used the identity of another person "in relation to one of the crimes charged in Counts One through Thirteen." Id. at 17–18. He does not suggest that this instruction was legally incorrect; rather, he maintains that the inclusion of all thirteen health care fraud counts was improper because the identify theft charge related to only eight of those counts. This argument does not establish that Dr. Saoud suffered prejudice from the district court's denial of his motion to sever or continue.

9

endeavoring to obstruct and impede the due administration of the internal revenue laws, and making a false statement to a federal agent. He bears a heavy burden: we will reverse on insufficiency grounds "only 'where the prosecution's failure is clear.'" United States v. Perry, 757 F.3d 166, 175 (4th Cir. 2014) (quoting United States v. Foster, 507 F.3d 233, 244–45 (4th Cir. 2007)). "[V]iewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government," id., we must determine "whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt," id. (quoting United States v. Burgos, 94 F.3d 849, 863 (4th Cir. 1996) (en banc)) (internal quotation marks omitted).

For the following reasons, we find that sufficient evidence supported each of Dr. Saoud's challenged convictions. We begin with a discussion of Dr. Saoud's health care fraud convictions, then turn to his convictions for making a false oath or account in relation to a bankruptcy case, and finally consider his tax-related convictions.

i.

Dr. Saoud argues that sufficient evidence supported none of his thirteen convictions for health care fraud.[2] With respect to counts one through five, he maintains that the government presented no evidence that he "defrauded any health care benefit program" or "violated the negotiated settlement agreement." Appellant's Br. at 19-20. As for counts six through thirteen, Dr. Saoud submits that there "was no evidence that [he] was involved with [CWVD] at the time [it submitted invoices falsely indicating that Dr. Swisher had provided pathology services], or that Dr. Saoud provided these services." Id. at 20. We disagree.

The government presented evidence that Dr. Saoud fraudulently attempted to conceal his interests in AGS and CWVD. He performed these fraudulent acts because, as a person excluded from the federal health care programs, he could not maintain a "direct or indirect ownership or control interest of five percent or more in an entity that participates in Medicare or a State health care program," 42 C.F.R. § 1003.102(b)(12)(i); see

_____

[2] A person commits health care fraud where, "in connection with the delivery of or payment for health care benefits, items, or services," he "knowingly and willfully executes, or attempts to execute, a scheme or artifice . . . (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program." 18 U.S.C. § 1347(a).

11

also 42 U.S.C. § 1320a-7(b)(8)(A)(i), or exercise "operational or managerial control" over such an entity, 42 U.S.C. § 1320a-5(b). A violation of either prohibition exposed Dr. Saoud to financial penalties, see 42 C.F.R. § 1003.102(b)(12), and the entity to exclusion from the health care programs, see 42 U.S.C. § 1320a-7(b)(8). Substantial evidence supports the jury's conclusion that Dr. Saoud committed health care fraud in his attempts to hide his ownership of, and control over, AGS and CWVD.

In count one, the grand jury charged Dr. Saoud with asking his colleagues to sign a document that included "false and misleading statements about . . . [Dr. Saoud's] financial and managerial interests in CWVD and AGS." J.A. 94. At trial, the government introduced evidence that Dr. Saoud asked three of his colleagues in February 2008 to sign an agreement stating that he "ha[d] no financial or managerial interest in [CWVD] and/or AGS." J.A. 832. A reasonable jury could have concluded that this statement was untrue based on the government's evidence that Dr. Saoud maintained interests in both entities as of February 2008. We briefly summarize some of that evidence now.

On August 26, 2005--roughly two weeks after Dr. Saoud signed the settlement agreement and before CWVD had seen any patients--Dr. Saoud purported to sell, via a one-page contract, CWVD to Dr. Fred Scott, one of the doctors working at AGS, for

12

$1.6 million.  Dr. Scott testified at trial that he never owned CWVD, did not pay anything for the practice, and did not remember signing the sales contract.  This testimony supports the conclusion that Dr. Saoud continued to own CWVD after purportedly selling it to Dr. Scott.  Similarly, in March 2006-- after most of AGS's patients had transferred to CWVD--Dr. Saoud executed a one-page contract that appeared to transfer AGS to Georgia Daniel, one of AGS's nurse practitioners, for $1 million.  When Daniel told Dr. Saoud that she could not afford to pay $1 million, he provided her with a document stating that she would not be responsible for paying that sum because he would recoup it from AGS's future proceeds.  The government also introduced evidence that, after ostensibly selling the company to Daniel, Dr. Saoud represented himself as AGS's president and continued to manage AGS's day-to-day operations.  Viewed in the light most favorable to the government, this evidence supports the conclusion that Dr. Saoud had a financial or managerial interest in CWVD or AGS in February 2008.

Count two alleged that Dr. Saoud "executed a Purchase Agreement to sell [CWVD] assets to [Daniel]."  J.A. 94.  The government presented evidence that Dr. Saoud signed an agreement in October 2008 purporting to transfer CWVD from Dr. Scott to Daniel.  Daniel testified that she did not recall signing this agreement and did not own CWVD.  A reasonable jury could have

13

concluded from this testimony that the October 2008 agreement was a sham.

Count three charged Dr. Saoud with executing another purchase agreement, this time in March 2009, "in which [Dr. Timothy Peasak] agrees to buy [CWVD] from [Daniel]." J.A. 94. The government produced this agreement at trial. It appeared to contain both Dr. Peasak's and Daniel's signatures, but both witnesses testified that they did not sign the agreement. Daniel explained that she "would know if [she] signed a document [stating] that [she] sold a business [she] didn't own to [Dr.] Peasak." J.A. 1038. Dr. Peasak testified that he "one hundred percent didn't sign" the purchase agreement. J.A. 1188. This testimony supports the jury's conclusion that the March 2009 agreement was a sham.

Count four charged Dr. Saoud with signing an affidavit in May 2009 "that makes various representations about [AGS]'s operations and medical records." J.A. 94. The government presented this affidavit to the jury. Dr. Saoud states in the affidavit that AGS was "only a medical billing service" and that "all medical records are always under the control of the patients, doctors, or [CWVD]." J.A. 1082. The jury could have reasonably concluded, based on the sum of the government's evidence, that AGS and CWVD together comprised one medical practice, that Dr. Saoud controlled the practice, and that Dr.

14

Saoud was attempting to conceal these facts when he signed the May 2009 affidavit.

Count five alleged that, in October 2009, Dr. Saoud sent a letter to an Internal Revenue Agent stating "that he had 'no relationship with [CWVD] since it was sold . . . in the third quarter of 2005.'" J.A. 94. The government produced this letter at trial. Dr. Scott's, Daniel's, and Dr. Peasak's testimonies that they never owned CWVD support the conclusion that, contrary to what he wrote in the October 2009 letter, Dr. Saoud had an ongoing relationship with CWVD after August 2005.

In count six, the grand jury alleged that, after Dr. Scott stopped working for CWVD in June 2009, Dr. Saoud "solicited [Dr. Swisher] to be [Dr. Saoud's] lab director without advising [Dr. Swisher] that his name and provider number would be used for billing and that the relevant lab services involved dermatological pathology." J.A. 96. Similarly, the grand jury charged Dr. Saoud in count seven with having "knowingly and willfully aided, abetted, counseled, commanded, induced, and procured the request for [Dr. Swisher] to sign a Medicare Enrollment Application for CWVD." Id. The government introduced evidence that Dr. Saoud approached Dr. Swisher, a longtime acquaintance, to become CWVD's lab director. Dr. Swisher testified that he thought he "would just be signing off on the certification and policies." J.A. 1197. Dr. Swisher

15

agreed, and Dr. Saoud brought paperwork, including a Medicare application, to Dr. Swisher's office. Dr. Swisher signed the Medicare application because he "assumed that was required to be [Dr. Saoud's] lab director." J.A. 1201. Thereafter, Dr. Swisher had no involvement with CWVD; he "never gave permission for [his] name or numbers to be used for billing." J.A. 1205. Nonetheless, CWVD billed insurance companies for dermatological pathology services that Dr. Swisher ostensibly provided. A reasonable jury could conclude from this testimony that Dr. Saoud fraudulently obtained Dr. Swisher's signature in order to use Dr. Swisher's name for dermatological billings.

Counts eight through thirteen charged Dr. Saoud with six counts of health care fraud based on bills submitted by CWVD to six insurance companies indicating that Dr. Swisher had performed dermatological services. A reasonable jury could have concluded that these bills were fraudulent, and that Dr. Saoud executed CWVD's scheme to submit these fraudulent bills. Dr. Swisher's testimony supports the conclusion that he did not bill for these services. And a reasonable jury could conclude that Dr. Saoud controlled CWVD based on the evidence that he never sold CWVD and Dr. Swisher's testimony that Dr. Saoud recruited him to be CWVD's lab director.

16

ii.

We turn now to Dr. Saoud's five convictions for making a false oath or account in relation to a bankruptcy case. Dr. Saoud filed for bankruptcy on behalf of AGS in May 2009. He subsequently testified under oath three times: at creditors meetings in June 2009 and August 2009, and at a May 2010 deposition. The jury convicted Dr. Saoud of making one false statement during his August 2009 testimony and four false statements at his deposition, all in violation of 18 U.S.C. § 152(2).[3] Dr. Saoud argues that the government failed to introduce evidence that anything he said was materially false. We address each of the five counts in turn.

The grand jury alleged in count twenty-three that, during his August 2009 testimony, Dr. Saoud "falsely testified under oath that he was not the president of [AGS] as of May 12, 2009." J.A. 105. The government presented evidence that Dr. Saoud gave this testimony. The government also introduced an affidavit that Dr. Saoud signed in May 2009 in which Dr. Saoud identifies himself as "the president and CEO of AGS." J.A. 1081–82. A reasonable jury could have concluded from this evidence that Dr. Saoud was acting as AGS's president on May 12, 2009.

---

[3] Section 152(2) prohibits a person from "knowingly and fraudulently mak[ing] a false oath or account in or in relation to any case under [the Bankruptcy Code]." 18 U.S.C. § 152(2).

17

The remaining four counts of conviction pertain to Dr. Saoud's May 2010 deposition testimony. Count twenty-six alleged that Dr. Saoud "falsely testified under oath that he did not have any connection with [CWVD]." J.A. 106. The jury heard evidence that Dr. Saoud testified that he had no connection with CWVD after selling the practice to Dr. Scott in August 2005. The jury could have concluded that this testimony was false based on Dr. Scott's testimony that he never owned CWVD.

Count twenty-seven charged Dr. Saoud with having "falsely testified under oath that he did not have any further involvement with AGS after its purported sale in March[] 2006." J.A. 106. The jury heard evidence that Dr. Saoud testified that he had "no further involvement with AGS" after selling it to Daniel in March 2006. J.A. 1126. The jury could have concluded that this statement was false based on Dr. Saoud's May 2009 affidavit stating that he was "the president and CEO of AGS." J.A. 1081–82.

In count twenty-eight, the grand jury alleged that Dr. Saoud "falsely testified under oath that [CWVD] is a 'totally different corporation' from AGS 'that actually saw a totally different group of patients in different towns.'" J.A. 106. The government presented evidence that Dr. Saoud gave this testimony at his May 2010 deposition. The jury also heard evidence that conflicted with this testimony. One witness

18

agreed that "[CWVD] provided the same services to the vast majority of the same patients of AGS." J.A. 532–33. That witness also confirmed that the patients of both entities went to "a lot of the same clinics" in the "same office." J.A. 533. This testimony supports the conclusion that Dr. Saoud testified falsely when he said that AGS and CWVD saw different patients.

Count thirty alleged that Dr. Saoud "falsely testified under oath that he 'was not involved' in the sale of . . . [AGS]'s pathology business to [CWVD]." J.A. 107. As the jury heard, Dr. Saoud testified that he recommended that AGS sell its pathology business to CWVD, but was "not involved in the sale." J.A. 1157. However, Dr. Scott testified that, after he discovered that Dr. Saoud was receiving a "large amount of money" from AGS's pathology business, Dr. Saoud told him that he, Dr. Scott, would be "buying [that business] for two hundred and forty, two hundred and fifty thousand a year for four or five years." J.A. 921; see also id. at 922. In addition, Dr. Swisher testified that Dr. Saoud recruited him to be CWVD's lab director. The evidence provided by Dr. Scott and Dr. Swisher supports the inference that Dr. Saoud orchestrated the sale of AGS's pathology business.

iii.

In his final two challenges to the sufficiency of the evidence, Dr. Saoud argues that his two tax-related convictions

19

must be reversed.  He claims that AGS's and CWVD's tax returns show that "all of [his] statements were correct."  Appellant's Br. at 29.[4]

The jury convicted Dr. Saoud of corruptly endeavoring to obstruct and impede the due administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a), and making a false statement to a federal agent, in violation of 18 U.S.C. § 1001(a)(3).[5]  The grand jury alleged that Dr. Saoud committed

---

[4] Dr. Saoud also argues that the district court erred by not permitting him to question Special Agent Jeffrey James about a report that Special Agent James prepared.  See Appellant's Br. at 29–30.  Dr. Saoud argued at trial that this report should have been admitted because it "indicat[es] that there are records that have been destroyed."  J.A. 1332.  The district court ruled that Dr. Saoud could not cross-examine Special Agent James about this report because "the fact that there may be some records that have been destroyed that relate to [Dr. Saoud] is not sufficient for [Dr. Saoud] to start inquiring about it." J.A. 1333.  Dr. Saoud speculates on appeal that the destroyed documents may have included a signed copy of the February 2008 resolution referenced in count one.  This speculation does not establish that the district court abused its discretion by forbidding Dr. Saoud to ask about the report, and it does not establish that insufficient evidence supported either of Dr. Saoud's tax-related convictions.

[5] Section 7212(a) criminalizes, among other acts, "corruptly . . . obstruct[ing] or imped[ing], or endeavor[ing] to obstruct or impede, the due administration of [the Internal Revenue Code]."  26 U.S.C. § 7212(a).  A person violates § 1001(a)(3) where, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, [that person] knowingly and willfully," 18 U.S.C. § 1001(a), "makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry," id. § 1001(a)(3).

both crimes[6] by "falsely stating in a[n] October 5, 2009 letter to a Revenue Agent of the Internal Revenue Service that [Dr. Saoud] was not an officer of [AGS], and that he had 'no relationship with [CWVD] since it was sold . . . in the third quarter of 2005.'" J.A. 102; accord J.A. 108.

The government introduced evidence that, in October 2009, Dr. Saoud sent a letter to an Internal Revenue Agent stating that he "d[id] not own any portion of AGS," that he was not an officer of AGS, and that he had "no relationship with [CWVD] since it was sold to [Dr. Scott] in 2005." J.A. 1237–38. Dr. Saoud argues that these statements could not form the basis for a conviction under § 7212(a) or § 1001(a)(3) because the statements were truthful. He explains that the evidence demonstrated that "Daniel owned [AGS] and [Dr. Scott] owned [CWVD]" because "tax returns filed with the Internal Revenue Service . . . listed [Daniel] as 100% owner of [AGS] and [Dr. Scott] as 100% owner of [CWVD]." Appellant's Br. at 29. At most, Dr. Saoud establishes that some evidence supported his

---

[6] Dr. Saoud argues that these counts were multiplicitous because they concern the same act. Appellant's Br. at 30–31. "Multiplicity is 'the charging of a single offense in several counts.'" United States v. Lawing, 703 F.3d 229, 235 n.7 (4th Cir. 2012) (quoting United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993)). The tax-related counts were not multiplicitous because a defendant commits two offenses by violating both § 7212(a) and § 1001(a)(3).

21

version of the facts.[7] But Dr. Saoud cannot carry his burden by pointing to evidence that supports his position; at this point, he must show that the government failed to present evidence sufficient to support the verdict. And the record establishes that sufficient evidence supported the jury's conclusion that Dr. Saoud's October 2009 letter contained a materially false statement. For example, Dr. Saoud stated in the letter that he had no relationship with CWVD after August 2005, but, as we have already discussed, the government introduced evidence that Dr. Saoud never actually sold CWVD.

## C.

Dr. Saoud argues that jury misconduct tainted his trial because "two jurors failed to answer [the district court's questions] truthfully during voir dire" and "the jury failed to

---

[7] Dr. Saoud submits that the tax returns listing Daniel and Dr. Scott as the owners of AGS and CWVD should have "estopped [the Government] from claiming [that] Dr. Saoud owned [CWVD] or [AGS] after the entities were sold." Appellant's Br. at 23; see also id. at 24 (arguing that Daniel is estopped from disclaiming ownership because the bankruptcy court found that she waived any objection to defects in the bankruptcy petition). Dr. Saoud supports his argument by citing In re Breibart, 325 B.R. 724 (Bankr. D.S.C. 2004), in which a bankruptcy court noted that "quasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." Id. at 727 (quoting In re Robb, 23 F.3d 895, 898 (4th Cir. 1994)) (internal quotation marks omitted). This case does not support Dr. Saoud's argument because the government, which is the relevant party here, took no inconsistent positions. Inaccurate information provided by taxpayers does not bind the government.

22

follow the [district court's] instruction regarding deliberation." Appellant's Br. at 31–34. We disagree.

With respect to voir dire, Dr. Saoud alleges that one juror "is a previous patient of [Dr. Scott]" who failed to inform the court of this fact when it asked if anyone knew Dr. Scott. Appellant's Br. at 31. Dr. Saoud also alleges that another juror "works at the Veteran's Administration nursing home[] with [prosecution] witness James B. Hill," and that this juror failed to respond when the court asked whether any member of the jury knew Dr. Hill. Id. at 33. Dr. Saoud has not shown that he is entitled to a new trial based on these alleged acts of dishonesty because, among other reasons, he has not shown that the jurors' "motives for concealing information . . . affect[ed] the fairness of [his] trial." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); accord Conaway v. Polk, 453 F.3d 567, 588 (4th Cir. 2006). Indeed, he does not suggest a possible motive for concealing this information.

With regard to the district court's deliberation instruction, Dr. Saoud notes that the jury deliberated for only "112 minutes" after the district court added the second alternate juror. Appellant's Br. at 34. He argues that this timeline establishes that the jury failed to follow the district court's instruction to the jury that it "deliberate with each other with regard to each and every Count." J.A. 1983.

23

The length of the jury's deliberation here does not overcome the general presumption that "juries follow courts' instructions." United States v. McLaurin, 764 F.3d 372, 391 (4th Cir. 2014). The transcript indicates that the jury deliberated for at most 137 minutes after the second alternate juror joined the jury.[8] This timeline does not establish juror misbehavior because nothing prevented the jury from deliberating over thirty-two counts in just over two hours. We agree with our sister circuits that "brief jury deliberation alone is not a sufficient basis for a new trial." United States v. Aguilera, 625 F.3d 482, 487 (8th Cir. 2010) (citing cases from the First, Fifth, and Seventh Circuits).

D.

Dr. Saoud argues that his sentence is procedurally unreasonable because it "was driven by the loss claimed by the Government in health care dollars when in actuality, the Government sustained no loss." Appellant's Br. at 37. We find no error.

At sentencing, the district court applied an eighteen-level enhancement after determining that Dr. Saoud "intended" to cause

---

[8] Dr. Saoud writes that the jury deliberated for at most 112 minutes because jury deliberations resumed at "1:00 pm" and concluded at "2:53 pm." Appellant's Br. at 34. However, the transcript indicates that the jury left the courtroom at "12:35 p.m.," J.A. 1984, and the district court announced at "2:52 p.m." that the jury had reached a verdict, J.A. 1985.

24

a loss of $2.9 million. J.A. 2296–97; see also U.S.S.G. § 2B1.1 cmt. n.3(A) (providing that "loss is the greater of actual loss or intended loss"). The district court arrived at this number by combining the amounts that Dr. Saoud attempted to recoup from AGS and CWVD after purportedly selling those companies.

Dr. Saoud argues that the loss calculation was erroneous because the government failed to show that it sustained any loss from Dr. Saoud's fraud. But the district court did not base its calculation on the losses Dr. Saoud actually caused the government; it based it on the money that Dr. Saoud intended to gather when he tried to collect $2.9 million from AGS and CWVD after ostensibly selling those practices. Dr. Saoud's argument fails because it does not purport to address the district court's reasoning.

E.

Dr. Saoud's final argument on appeal is that the district court's $1,243,118.29 forfeiture determination is erroneous because that sum is not traceable to any health care offense. See Appellant's Br. at 34–36. We find no error.

Federal law provides that, when "imposing sentence on a person convicted of a Federal health care offense," a district court "shall order the person to forfeit property . . . that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C.

25

§ 982(a)(7). Here, the district court ordered Dr. Saoud to forfeit $1,243,118.29 after finding that the government had proven at trial that this amount was "traceable to the defendant's healthcare fraud." J.A. 2332. The district court explained that Dr. Saoud would not have received "payments from the fraudulent sale of AGS, loan repayments by [CWVD], payment for professional fees, [or] rent payments for use of facilities and equipment" but for his "fraud scheme." Id.

Dr. Saoud argues that he should not have to forfeit all of his proceeds from AGS and CWVD because those practices provided, and appropriately received compensation for, dermatological services. See Appellant's Br. at 35 ("It is undisputed that no fraudulent billing took place involving [AGS] and [CWVD] in this alleged scheme."). We find Dr. Saoud's argument unpersuasive because § 982(a)(7) mandates forfeiture of "gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7) (emphasis added). The term "'gross proceeds' is properly interpreted to include the total amount of money brought in through the fraudulent activity, with no costs deducted or set-offs applied." United States v. Poulin, 461 F. App'x 272, 288 (4th Cir. 2012) (per curiam). Here, the government presented evidence that Dr. Saoud orchestrated a fraudulent scheme whereby he concealed his interests in AGS and CWVD in order to circumvent the terms of the settlement

26

agreement.  Every dollar that he received from these practices after his fraud began constitutes "gross proceeds" traceable to that fraud.

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

27